IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

E.P., BY AND THROUGH HIS
PARENTS, J.P. AND A.P.

    *Plaintiffs*,

    v.

HOWARD COUNTY PUBLIC SCHOOL
SYSTEM, *et al.*,

    *Defendants*.

Civil Action No. ELH-15-3725

## MEMORANDUM OPINION

E.P., a male teenage student, by and through his parents, J.P. and A.P. (the "Parents"), plaintiffs, filed suit against the Howard County Public School System ("HCPSS"); the Board of Education of Howard County; and Dr. Renee A. Foose, in her official capacity as Superintendent of HCPSS (collectively, "HCPSS" or "defendants"). ECF 2, Complaint.[1] Plaintiffs allege violations of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*; IDEA implementing regulations, 34 C.F.R. § 300.1 *et seq.*; the Education Article of the Maryland Code;[2] and Title 13A of the Code of Maryland Regulations ("COMAR"), 13A.05.01.01, *et seq. Id.* ¶¶ 1, 20-21.

---

[1] The Complaint (ECF 2) has been redacted to protect the names of the three plaintiffs. An unredacted version of the Complaint is docketed at ECF 1. Because the identities of the plaintiffs are not pertinent to the issues, I will cite to ECF 2.

[2] Maryland Code (2014 Repl. Vol., 2015 Supp.), §§8-401 *et seq.* of the Education Article is the Maryland corollary to IDEA. Plaintiffs have not specified the sections of the Education Article under which they have sued. ECF 2, ¶ 1.

In particular, plaintiffs challenge the Decision and Order of an Administrative Law Judge ("ALJ") of the Maryland Office of Administrative Hearings, issued in August 2015. *See* ECF 16, *Howard County Public Schools v. E.P., Student*, OAH No. MSDE-HOWD-OT-15-15272 ("Decision"). In the Decision, the ALJ determined, *inter alia*, that E.P. is not entitled to an Independent Educational Evaluation ("IEE") at public expense because the evaluation conducted by HCPSS was appropriate. ECF 2 at 29. Accordingly, plaintiffs ask this Court to order an IEE of E.P., at the expense of HCPSS, consisting of a "neuropsychological evaluation, and a Functional Behavior Assessment…." *Id.*

Plaintiffs have moved for summary judgment based on the administrative record (ECF 29), supported by a memorandum of law (ECF 30) (collectively, "Motion").[3] Defendants filed a combined cross motion for summary judgment and opposition to plaintiffs' Motion (ECF 32), supported by a memorandum of law (ECF 32-1) (collectively, "Cross Motion"), with exhibits. ECF 32-2 to ECF 32-5. In a combined submission, plaintiffs filed a reply with respect to the Motion and opposed the Cross Motion. ECF 34. Thereafter, defendants filed a reply as to their Cross Motion (ECF 35), supported by two exhibits. ECF 35-1; ECF 35-2.[4]

---

[3] Pursuant to 20 U.S.C. § 1415(i)(C)(ii), plaintiffs previously filed a motion to supplement the administrative record (ECF 15) with the neuropsychological-educational report of E.P. prepared by Lisi Levisohn, Ph.D. At plaintiffs' request, Dr. Levisohn evaluated E.P. in October and November 2015, *after* the ALJ issued his Decision, and she issued her report in March 2016. *See* ECF 15-3. By Memorandum (ECF 21) and Order (ECF 22) of October 23, 2016, I denied the motion.

Because of plaintiffs' financial circumstances, plaintiffs' counsel advanced the costs in connection with Dr. Levisohn. ECF 15-1 at 9 n. 4. Plaintiffs have clarified that they seek reimbursement for those costs. *Id.*

[4] The parties identified their submissions as motions for summary judgment. In this context, however, "the district court proceeding should more accurately be compared to a bench trial, decided on motions for judgment." *Taylor ex rel. Dolch v. Sandusky*, CCB-04-301, 2005 WL 524586, at *2 n. 1(D. Md. Mar. 4, 2005) (citing *County School Bd. of Henrico County, Virginia v. Z.P. ex rel. R.P.,* 399 F.3d 298, 309 n. 7 (4th Cir. 2005)).

On March 22, 2017, prior to the completion of the briefing for the cross motions, the Supreme Court decided *Endrew F. ex rel. Joseph F. v. Douglas County School District*, __ U.S.__, 137 S. Ct. 988 (2017), a case arising under the IDEA. Curiously, counsel did not address this case in their submissions. Accordingly, by Order of May 2, 2017 (ECF 36), I directed the parties simultaneously to submit memoranda addressing the impact, if any, of *Endrew F.* on the cross motions for summary judgment. And, I permitted simultaneous replies to the memoranda. *Id.* The parties submitted their memoranda on May 12, 2017. ECF 37 (plaintiffs); ECF 38 (defendants). They filed replies on May 22, 2017. ECF 39 (plaintiffs); ECF 40 (defendants).

Of import here, this is not a case where the Parents filed a due process complaint under 34 C.F.R. § 300.507, to establish the improper denial of a "free appropriate public education" or to establish that E.P. should have been found eligible for special education services. Rather, this is a case in which HCPSS filed a due process complaint, pursuant to 34 C.F.R. § 300.502(b)(2)(i)-(ii), to defend its educational and psychological assessments of E.P. Accordingly, the suit does not implicate the determination of E.P.'s individualized education program ("IEP") team, which found that E.P. is not eligible for special education services under IDEA; the IEP team's eligibility determination is not relevant to the question of whether HCPSS's evaluation was appropriate. *See* 20 U.S.C. § 1414(d)(1)(B), discussed, *infra*.

No hearing is necessary to resolve the motions. *See* Local Rule 105.6. For the reasons that follow, I shall deny the Motion and grant the Cross Motion. Accordingly, I shall affirm the ALJ's Decision.

# I.       Statutory Framework

"Congress enacted IDEA in 1970[] to ensure that all children with disabilities are provided 'a free appropriate public education which emphasizes special education and related services designed to meet their unique needs [and] to assure that the rights of [such] children and their parents or guardians are protected.'" *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239 (2009) (citation omitted) (alterations in *Forest Grove*); *see also see also M.L. by Leiman v. Smith*, __F.3d__, 2017 WL 3471257, at *4 (4th Cir. Aug 14, 2017); *Sellers v. Sch. Bd. of City of Manassas*, 141 F.3d 524, 527 (4th Cir.) ("[T]he touchstone of IDEA is the actual provision of a free appropriate public education."), *cert. denied,* 525 U.S. 871 (1998).[5]   To this end, IDEA mandates that "all states receiving federal funds for education must provide disabled schoolchildren with a 'free appropriate public education,'" commonly referred to as a "FAPE." *J.P. ex rel. Peterson v. Cnty. Sch. Bd.*, 516 F.3d 254, 257 (4th Cir. 2008) (citation omitted).

In 20 U.S.C. § 1401(9), "free appropriate public education" is defined as follows:

[S]pecial education and related services that—

(A) have been provided at public expense, under public supervision and direction, and without charge;

(B) meet the standards of the State educational agency;

(C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and

---

[5] The IDEA "was enacted as the Education of the Handicapped Act, and was renamed the Individuals with Disabilities Education Act in 1990." *Forest Grove Sch. Dist.*, 557 U.S. at 239 n. 6.

As noted, plaintiffs also allege violations of Maryland statutes and regulations designed to implement the IDEA. *See* Md. Code (2014 Repl. Vol., 2015 Supp.), §§8-401 *et seq.* of the Education Article; COMAR 13A.05.01.01, *et seq.*  Of import, "[t]hese statutes and regulations… do not deviate materially from their federal counterparts." *M.L.*, 2017 WL 3471257, at *3 n. 5; *see generally John A. v. Bd. of Educ.*, 400 Md. 363, 929 A.2d 136, 140–43 (Md. 2007) (discussing the requirements of the IDEA and citing to its Maryland counterpart).

> (D) are provided in conformity with the individualized education program....

"Special education" is "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including (A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and (B) instruction in physical education." *Id.* § 1401(29). "The goals of the 'specially designed instruction' are '(i) [t]o address the unique needs of the child that result from the child's disability; and (ii) [t]o ensure access of the child to the general curriculum, so that the child can meet the educational standards within the jurisdiction of the public agency that apply to all children.'" *M.L.*, 2017 WL 3471257, at *4 (quoting 34 C.F.R. § 300.39(b)(3) ( alterations in *ML*).

IDEA "imposes an affirmative obligation on any state receiving federal assistance to identify and evaluate all children suffering from disabilities who may be in need of special education and related services." *Sch. Bd. of the City of Norfolk v. Brown*, 769 F. Supp. 2d 928, 941 (E.D. Va. 2010); *see* 34 C.F.R. § 300.111(a). "This duty is known as the 'child find' obligation." *Brown*, 769 F. Supp. 2d at 941. Judge Hazel of this Court recently explained:

> The child find obligation extends to "children who are suspected of being a child with a disability under § 300.8 and in need of special education, even though they are advancing from grade to grade." 34 C.F.R. § 300.111(c). Failure to comply with "child find" may constitute a "procedural violation" of the IDEA. *Brown*, 769 F. Supp. 2d at 942 (citing *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230 (2009)).

*T.B. ex rel. T.B. v. Prince George's Cty. Bd. of Educ.*, GJH-15-03935, 2016 WL 7235661, at *8 (D. Md. Dec. 13, 2016), *appeal dismissed sub nom. T. B., JR. V. PRINCE GEORGE'S COUNTY* (Jan. 12, 2017), and appeal filed Case. No. 17-1877, July 27, 2017.

In other words, the child-find "requirement requires school districts [to] identify and evaluate all students who are reasonably suspected of having an educational disability under

IDEA." *W. Chester Area Sch. Dist. v. G.D.*, No. CV 16-4471, 2017 WL 379440, at *3 (E.D. Pa. Jan. 25, 2017) (internal quotation marks and citation omitted, alteration added). In order "[t]o be considered a member of the IDEA's protected class, the individual must be classified as having a recognized disability." *Carter by Ward v. Prince George's Cnty. Pub. Sch.*, 23 F. Supp. 2d 585, 589 (D. Md. 1998); *see also* 20 U.S.C. § 1401(3) (listing the covered disabilities under IDEA).

Notably, "[a] school provides a FAPE by developing an IEP for each disabled child." *J.P.*, 516 F.3d at 257. The IEP consists of "a written statement for each child with a disability," 20 U.S.C. § 1414(d)(1)(A)(i), which "'must contain statements concerning a disabled child's level of functioning, set forth measurable annual achievement goals, describe the services to be provided, and establish objective criteria for evaluating the child's progress.'" *J.P.*, 516 F.3d at 257 (citation omitted).

An IEP is developed "only after careful consideration of the child's present levels of achievement, disability, and potential for growth." *Endrew F.*, 137 S. Ct. at 999. An IEP should be "'reasonably calculated to enable the child to receive educational benefits.'" *J.P.*, 516 F.3d at 247 (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982)). Moreover, "[t]he adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." *Endrew F.*, 137 S. Ct. at 1001.

Under 20 U.S.C. § 1414(d)(1)(B), an IEP team refers to

"a group of individuals composed of--

(i) the parents of a child with a disability;

(ii) not less than 1 regular education teacher of such child (if the child is, or may be, participating in the regular education environment);

(iii) not less than 1 special education teacher, or where appropriate, not less than 1 special education provider of such child;

(iv) a representative of the local educational agency who--
    (I) is qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities;

    (II) is knowledgeable about the general education curriculum; and

    (III) is knowledgeable about the availability of resources of the local educational agency;

(v) an individual who can interpret the instructional implications of evaluation results, who may be a member of the team described in clauses (ii) through (vi);

(vi) at the discretion of the parent or the agency, other individuals who have knowledge or special expertise regarding the child, including related services personnel as appropriate; and

(vii) whenever appropriate, the child with a disability.

In *Endrew F.*, 137 S. Ct. at 999, the Supreme Court recently held that, "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." The Court also observed "[t]hat the progress contemplated by the IEP must be appropriate in light of the child's circumstances…" *Id.* Notably, the Supreme Court emphasized that the standard is "markedly more demanding" than the standard that had been applied by the Tenth Circuit, *i.e.*, that an IEP is adequate so long as it is calculated to confer an educational benefit that is "merely more than *de minimis.*" *Id.* at 1000 (emphasis in original). Nevertheless, an "IEP need not aim for grade-level advancement" if such a goal "is not a reasonable prospect for a child." *Id.*

In the recent case of *M.L.*, the Fourth Circuit acknowledged that its "prior FAPE standard is similar to that of the Tenth Circuit, which was overturned by *Endrew F.*" *M.L.*, 2017 WL 3471257, at *6. The Fourth Circuit also characterized *Board of Education v. Rowley*, 458 U.S. 176 (1982), as the "leading IDEA case". *M.L.*, 2017 WL 3471257, at *4. Explaining *Rowley*, the Fourth Circuit said that a "'free appropriate public education' did not mandate 'equality' or

any requirement that schools provide the same education to students with disabilities as that provided to students without disabilities." *M.L.*, 2017 WL 3471257, at *5 (quoting *Rowley*, 458 U.S. at 198). Rather, "a school is required only to provide 'equal *access*.'" *M.L.*, 2017 WL 3471257, at *5 (quoting *Rowley*, 458 U.S. at 200) (emphasis added in *M.L.*).

"Parents and guardians play a significant role in the IEP process." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005). Accordingly, IDEA "provides a panoply of procedural rights to parents to ensure their involvement in decisions about their disabled child's education." *Sellers*, 141 F.3d at 527. Through these procedures, IDEA "'guarantee[s] parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate.'" *AW ex rel. Wilson v. Fairfax Cnty. Sch. Bd.*, 372 F.3d 674, 678 (4th Cir. 2004) (brackets in original) (quoting *Honig v. Doe*, 484 U.S. 305, 311–12 (1988)). "This includes the 'opportunity to present complaints with respect to any matter relating to the identification, evaluation, or *educational placement* of the child.'" *AW*, 372 F.3d at 678 (quoting 20 U.S.C. § 1415(b)(6); emphasis in *AW*).

Of relevance here, if the parent disagrees with the school's evaluation, the IDEA permits a parent, under certain circumstances, "to obtain an independent educational evaluation of the child", that is, an IEE, at public expense. *Rowley*, 458 U.S. at 183 n. 6 (citation omitted); *see also* 20 U.S.C. §1415(b)(1). The implementing regulation, codified at 34 C.F.R. §300.502(b), provides, in relevant part:

> (b) Parent right to evaluation at public expense.
>
> (1) A parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency, subject to the conditions in paragraphs (b)(2) through (4) of this section.

(2) If a parent requests an independent educational evaluation at public expense, the public agency must, without unnecessary delay, either—

(i) File a due process complaint to request a hearing to show that its evaluation is appropriate; or

(ii) Ensure that an independent educational evaluation is provided at public expense, unless the agency demonstrates in a hearing pursuant to §§ 300.507 through 300.513 that the evaluation obtained by the parent did not meet agency criteria.

(3) If the public agency files a due process complaint notice to request a hearing and the final decision is that the agency's evaluation is appropriate, the parent still has the right to an independent educational evaluation, but not at public expense.

Notably, a parent is only entitled to reimbursement for the IEE if the evaluation by the public agency was not appropriate. 34 C.F.R. §300.502(b)(3). Federal law sets out clear requirements for an appropriate evaluation, including that a district "use a variety of assessment tools [and] not use any single measure or assessment ..." 20 U.S.C. § 1414(b)(2)(A). In addition, the evaluation must be "administered by trained and knowledgeable personnel", *i.e.*, by qualified examiners. 20 U.S.C. § 1414(b)(3)(A)(iv). These requirements are discussed in more detail, *infra*.

If the public agency files a due process complaint under 34 C.F.R. § 300.502(b), "the parents or the local educational agency involved in such complaint shall have an opportunity for an impartial due process hearing, which shall be conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency." 20 U.S.C. § 1415(f)(1)(a). Therefore, Md. Code (2014 Repl. Vol., 2015 Supp.), §§ 8–413(d), (e), and (j) of the Education Article ("Ed.") are pertinent. These sections establish that, upon the filing of a "due process complaint," an administrative law judge, serving as the "impartial hearing officer" as required by the IDEA, shall conduct a hearing, the result of which can be

appealed within 120 days to federal court or to the circuit court for the county in which the child resides. Ed. §§ 8–413(a), (d), (e), and (j). At the administrative hearing, "[t]he standard of proof in a contested case shall be the preponderance of evidence unless the standard of clear and convincing evidence is imposed on the agency by regulation, statute, or constitution." Md. Code (2014 Repl. Vol.), § 10-217 of the State Government Article ("S.G.").

20 U.S.C. § 1415(i)(2)(A) is also pertinent:

> Any party aggrieved by the findings and decision made under subsection (f) ... who does not have the right to an appeal under subsection (g) ... shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy.

If the hearing "is conducted by a local educational agency, any party aggrieved by the findings and decision rendered in such a hearing may appeal such findings and decision to the State educational agency." 20 U.S.C. § 1415(g)(1). Here, the hearing was not conducted by a local educational agency. Rather, it was conducted by a State agency, *i.e.*, the Maryland Office of Administrative Hearings. Accordingly, plaintiffs have the right to bring a civil action in this Court, pursuant to 20 U.S.C. § 1415(i)(2)(A).

## II.     Standard of Review

Pursuant to 20 U.S.C. § 1415(i)(2)(C), a district court reviewing a decision of the state agency "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." A court reviewing an administrative decision under the IDEA conducts a "'modified de novo review, giving due weight to the underlying administrative proceedings.'" *M.L.*, 2017 WL 3471257, at *3 (quoting *O.S. v. Fairfax Cty. Sch. Bd.*, 804 F.3d 354, 360 (4th Cir. 2015)).

Notably, "the hearing officer's factual findings are considered prima facie correct." *O.S.*, 804 F.3d at 360. Nevertheless, the reviewing court must make an "'independent determination'" regarding whether the school complied with IDEA. *M.L.*, 2017 WL 3471257, at *3 (citation omitted); *see Doyle v. Arlington Cty. Sch. Bd.*, 953 F.2d 100, 103 (4th Cir. 1991) ("Generally, in reviewing state administrative decisions in IDEA cases, courts are required to make an independent decision based on a preponderance of the evidence, while giving due weight to state administrative proceedings."); *see also SE.H. v. Bd. of Educ. of Anne Arundel Cty. Pub. Sch.*, 647 F. App'x 242, 247 (4th Cir. 2016) (per curiam); *MM ex rel. DM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 530-31 (4th Cir. 2002); *T.B. ex rel. T.B.*, *supra*, 2016 WL 7235661, at *5; *Wagner v. Bd. of Educ. of Montgomery Cty.*, 340 F. Supp. 2d 603, 611 (D. Md. 2004).

In *T.B.*, 2016 WL 7235661, Judge Hazel thoroughly summarized the process that governs review of an IDEA case resolving cross motions for summary judgment, *id.* at *5–6:

> In evaluating the administrative findings, findings of fact which are "made in a regular manner and have evidentiary support" are considered "prima facie" correct and a reviewing court that does not adhere to the factual findings must explain its deviation. *Doyle v. Arlington Cty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991). In determining whether such factual findings were "regularly made," a reviewing court "should examine the way in which the state administrative authorities have arrived at their administrative decisions and the methods employed." *Id.* Courts should be particularly hesitant to disturb the "ALJ's determinations of the credibility of witnesses" as "the fact-finder, who has the advantage of hearing the witnesses, is in the best position to assess credibility." *Wagner,* 340 F. Supp. 2d at 611 (quoting *Justin G. v. Bd. of Educ.*, 148 F. Supp. 2d 576, 588 (D. Md. 2001)); *see also Jana K. ex rel. Tim K. v. Annville-Cleona Sch. Dist.*, 39 F. Supp. 3d 584, 600 (M.D. Pa. 2014) ("[a]bsent non-testimonial, extrinsic evidence to the contrary, the court must accept the Hearing Officer's credibility determinations.") (citing *Carlisle Area Sch. v. Scott P. ex rel. Bess P.*, 62 F.3d 520, 529 (3d. Cir. 1995)).

> Once the reviewing court has given the administrative fact-findings due weight, it is then "free to decide the case on the preponderance of the evidence." *Doyle*, 953 F.2d at 105. A district court may, for example, "believe[ ] that the evidence considered as a whole point[s] to a different legal conclusion." despite accepting the factual findings of the officer below. *See Sumter Cty. Sch. Dist. 17*

*v. Heffernan ex rel. T.H.*, 642 F.3d 478, 485 (4th Cir. 2011). In making its determination, however, districts courts should not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Hartmann ex rel. Hartmann v. Loudoun Cty. Bd. of Educ.*, 118 F.3d 996, 1000 (4th Cir. 1997) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982)). Pure questions of law are reviewed de novo. *See E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ.*, 773 F.3d 509, 514 (4th Cir. 2014) (discussing exhaustion of administrative remedies as "pure question of law"); *Damarcus S. v. District of Columbia*, Civil Action No. 15-851 (ESH), 2016 WL 2993158, at *3 (D.D.C. May 23, 2016) (discussing the proper statutory construction of IDEA as a "pure question of law"); *Jana K.*, 39 F. Supp. 3d at 595 (M.D. Pa. 2014) ("[t]he district court's review of the hearing officer's application of legal standards and conclusions of law ... is subject to plenary review.").

Finally, "just as Plaintiffs were required to carry the burden of proof in the administrative hearing" *Weast v. Schaffer ex rel. Schaffer*, 377 F.3d 449, 456 (4th Cir. 2004), *aff'd*, 546 U.S. 49 (2005), Plaintiffs must also carry that burden in this court, as they are the party seeking relief. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005); *see also Wagner*, 340 F. Supp. 2d at 611 (describing Plaintiffs in IDEA cases as facing an "uphill battle").

As indicated earlier, an ALJ's factual findings are considered to be prima facie correct. *See, e.g.*, *M.L.*, 2017 WL 3471257, at *3; *MM*, 303 F.9d at 531; *see also O.S.*, 804 F.3d at 360. But, "[i]f the findings are not 'regularly made,'…they are not entitled to deference." *J.P.*, 516 F.3d at 259 (quoting *Doyle*, 953 F.2d at 105); *see also Cty. Sch. Bd. of Henrico Cty., Virginia v. Z.P. ex rel. R.P.*, 399 F.3d 298, 305 (4th Cir. 2005) ("[F]actual findings made during the state administrative proceeding are entitled to a presumption of correctness, so long as the findings were 'regularly made.'") (citation omitted).

In *J.P.*, 516 F.3d 254, the Fourth Circuit elaborated, *id.* at 259–60 (emphasis in original:

When determining whether a hearing officer's findings were regularly made, our cases have typically focused on the *process* through which the findings were made: "Factual findings are not regularly made if they are reached through a process that is far from the accepted norm of a fact-finding process." *Z.P.*, 399 F.3d at 305 (internal quotation marks omitted); *see also Doyle*, 953 F.2d at 105 ("[I]n deciding what is the due weight to be given an administrative decision under *Rowley*, we think a reviewing court should examine the way in which the state administrative authorities have arrived at their administrative decision and

the methods employed."). In this case, there is nothing in the record suggesting that the hearing officer's process in resolving the case was anything other than ordinary. That is, the hearing officer conducted a proper hearing, allowing the parents and the School Board to present evidence and make arguments, and the hearing officer by all indications resolved the factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case. Indeed, none of the deficiencies in the hearing officer's opinion identified by the district court have anything to do with the process through which the hearing officer made the required factual findings; as we will explain, the district court's criticisms instead focus on the manner in which the hearing officer expressed his view of the case.

Notably, the district court "'should be reluctant indeed to second-guess the judgment of education professionals.'" *MM,* 303 F.3d at 532 (quoting *Tice v. Botetourt County School Board,* 908 F.2d 1200, 1207 (4th Cir. 1990)); *see A.B.*, 354 F.3d at 325-26; *Wagner,* 340 F. Supp. 2d at 611 (recognizing that the reviewing court "owes generous deference…to the educators on [the student's] IEP Team"). The Court must not "'substitute [its] own notions of sound educational policy for those of local school authorities.'" *MM.,* 303 F.3d at 531 (citation omitted; alteration in *MM*). In addition, "in according 'due weight' to the findings of the ALJ, this court owes deference to the ALJ's determinations of the credibility of witnesses." *Wagner*, 340 F. Supp. 2d at 611; *see Justin G. v. Bd. of Educ.,* 148 F.Supp.2d 576, 588 (D. Md. 2001); *see also Doyle,* 953 F.2d at 104.

Of significance, "[p]rocedural violations committed by the hearing officer at a due process hearing only violate the IDEA if they "result in the loss of educational opportunity." *B.G. by J.A.G. v. City of Chicago Sch. Dist. 299*, No. 15 C 6372, 2017 WL 1049466, at *11 (N.D. Ill. Mar. 20, 2017) (quoting *Heather S. v. State of Wis.*, 125 F.3d 1045, 1054 (7th Cir. 1997)); *see also Gray ex rel. Gray v. O'Rourke*, 48 F. App'x 899, 901 & n. 6 (4th Cir. 2002)(per curiam); *Burke Cty. Bd. of Educ. v. Denton By & Through Denton*, 895 F.2d 973, 982 (4th Cir. 1990). "Ordinarily, procedural violations of IDEA are subject to harmlessness analysis." *Snyder*

*ex rel. Snyder v. Montgomery Cty. Pub. Sch.*, DKC-2008-1757, 2009 WL 3246579, at \*6 (D. Md. Sept. 29, 2009); *see also T.B.*, 2016 WL 7235661, at \*9.

"A child is 'deprived of a free appropriate public education' only if the procedural "violations are serious and detrimentally impact upon the child's right to a free public education,' or if the IEP is 'not reasonably calculated to enable the child to receive educational benefits.'" *T.B.*, 2016 WL 7235661, at \*9 (citation omitted). *See also Sch. Bd. of the City of Suffolk v. Rose*, 133 F. Supp. 3d 803, 819 (E.D. Va. 2015) (equating denial of FAPE with "loss of an educational opportunity for the disabled child" as opposed to "mere technical contravention of the IDEA").

In *Snyder*, 2009 WL 3246579, at \*6, Judge Chasanow said:

> As the Fourth Circuit explained in *DiBuo ex rel. DiBuo v. Bd. of Educ. of Worcester County,* 309 F.3d 184, 190 (4th Cir. 2002), "[t]o the extent that the procedural violations did not actually interfere with the provision of a free appropriate public education, these violations are not sufficient to support a finding that an agency failed to provide a free appropriate public education." (Quoting *Gadsby by Gadsby v. Grasmick,* 109 F.3d 940, 956 (4th Cir. 1997)). The court also reiterated that "under our circuit precedent, a violation of a procedural requirement of the IDEA (or one of its implementing regulations) must actually interfere with the provision of a FAPE before the child and/or his parents would be entitled to reimbursement relief," even where the procedural violation "causes interference with the parents' ability to participate in the development of their child's IEP." *DiBuo,* 309 F.3d at 190–91 (4th Cir. 2002); *see also A.K. ex rel. J.K. v. Alexandria City Sch. Bd.,* 484 F.3d 672, 679 n. 7 (noting that procedural violations are subject to "harmlessness analysis," while substantive violations of the IDEA are not).

Here, the ALJ heard three days of testimony from three expert witnesses, reviewed numerous exhibits, and issued a comprehensive 56-page opinion detailing his factual findings and conclusions of law. *See* ECF 16, Decision, at 5: *see also Rose*, 133 F. Supp. 3d at (finding that hearing officer's findings of fact were entitled to due weight where hearing officer "heard evidence from witnesses on direct, cross, and re-direct examination; admitted documentary

evidence; ruled on objections; ... and rendered a written final decision."); *T.B.*, 2016 WL 7235661, at *6.

In *M.L.*, 2017 WL 3471257 at *3, the Fourth Circuit observed that "[t]he determination of whether an IEP is adequate 'is itself a question of fact.'" (Citation omitted). By extension, the question of whether HCPSS conducted an appropriate or adequate evaluation of E.P. would also be a question of fact. Plaintiffs bear the burden of establishing, by a preponderance of evidence, that, despite the deference owed to the ALJ's factual findings, the HCPSS's evaluation of E.P. was inappropriate and therefore E.P. is entitled to an IEE at public expense. This is "an uphill battle . . . ." *Wagner*, 340 F. Supp. 2d at 611.

### III.    Factual and Procedural Background[6]

E.P. was born in January 2002. ECF 16, Decision, ¶ 1. He enrolled as a sixth grade student at Patuxent Valley Middle School (the "School") in HCPSS for the 2013-2014 school year. *Id.* ¶ 2. Previously, E.P. attended school in Prince George's County ("P.G. County"), where he was classified as a gifted student. *Id.* Prior to starting school at HCPSS, E.P. was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and received an "Accommodations Plan," pursuant to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. *Id.* ¶ 2; ECF 2, ¶¶ 2, 13.

During the 2013-2014 school year, E.P.'s Parents raised concerns about E.P.'s poor academic performance. ECF 16, Decision, ¶ 5. An IEP team met in October 2013 to discuss the concern that E.P. had an educational disability that warranted assessment. *Id.* The attendees

---

[6] The factual background is derived from the administrative record (ECF 16), which was filed only in paper format. It consists of the Decision, the transcript from the administrative hearing, and the exhibits that were introduced during the administrative hearing. Accordingly, when referring to specific documents within the administrative record, I refer to the document by its name. And, page numbers refer to the pages of the specific document.

included the Parents; Carol Aliprando, Administrator/Designee; Taylor Stetka, Special Educator; Rudolph Thompson, General Educator; MaryEllen Bowers, Speech Language Pathologist; and Alyson Celauro, Psychologist. ECF 16, IEP Team Meeting Report, October 28, 2013, at 3. After reviewing E.P.'s records and receiving input from his teachers, the team did not believe that E.P. had an educational disability. *Id.* However, E.P. was placed in an alternative education program during the third quarter of the 2013-2014 school year to provide him with support in "being organized and getting assignments done." *Id.* ¶ 7. Nonetheless, E.P. was required to repeat the sixth grade due to his poor performance and his poor record of attendance for the 2013-2014 school year, in which he was absent 22 times and tardy 73 times. ECF 16, Decision, ¶¶ 8-9. In E.P.'s second sixth grade year, the Parents asked HCPSS to evaluate him for eligibility for "Special Education services" under IDEA. ECF 2, ¶ 3.

At a meeting held on October 16, 2014, the IEP team discussed the Parents' concerns and the student's academic performance. ECF 16, Decision, ¶ 11. Thereafter, the IEP team referred E.P. for an educational assessment and a psychological assessment due to academic concerns and, based on the ADHD diagnosis, for suspected "Specific Learning Disability" ("SLD") or "Other Health Impairment" ("OHI"). ECF 16, Decision at 1; ¶ 11. The educational assessment was to include evaluations of "Reading Skills, Reading Comprehension, Reading Fluency, Math Calculation, Math Reasoning, and Written Calculation." *Id.* ¶ 12. And, the psychological assessment was to include evaluations of "Cognitive Ability, Attention/Behavior, Information Processing/Memory, and Specific Learning Strengths and Weaknesses." *Id.* In response to a request by E.P.'s Parents at a Section 504 meeting on September 8, 2014 (*id.* ¶¶ 10, 16), the IEP team also referred E.P. for a Functional Behavior Assessment ("FBA") to determine whether he required a Behavior Intervention Plan ("BIP").

The evaluations took place in November 2014 (*id.* at 1), when E.P. was twelve years of age. ECF 16, Decision, ¶ 1. The evaluations culminated in two reports: 1) an Educational Assessment Report dated November 14, 2014, authored by Margaret Bosse, Special Education Teacher and Team Leader, and 2) a Report of Psychological Assessment dated November 25, 2014, authored by Alyson Celauro, Ed.S., a Nationally Certified School Psychologist (collectively, "HCPSS Evaluation" or "Evaluation"). *See* ECF 16, Educational Assessment Report ("Educational Assessment"); ECF 16, Report of Psychological Assessment ("Psychological Assessment"). Celauro also conducted the FBA and concluded that a BIP was not warranted. ECF 16, Decision, ¶ 16.

### A. Educational Assessment

At the relevant time, Bosse was a Special Education Team Leader at the School. ECF 16, Decision, ¶ 17. In that position, Bosse served as the chair of the special education department. *Id.* Bosse holds a Bachelor of Science degree in Education, with a dual certification in elementary and special education. *Id.* ¶ 19. She earned a Master's in Education. *Id.* In addition, Bosse has a National Board Certification for "Students with Exceptional Needs," with additional certifications in Administrator I, Elementary and Middle School Education, Generic Special Education, and Middle School Mathematics. *Id.* She has taught special education students for approximately six years and, and since about 2010, she has conducted educational assessments of students to determine whether they qualify for special education. *Id.* ¶ 18. Moreover, Bosse has received training in the administration and interpretation of academic achievement tests. *Id.* ¶¶ 20, 21.

Bosse assessed E.P. during sessions held on November 12 and 14, 2014. ECF 16, Educational Assessment, at 1. The assessment consisted of Bosse's administration and

interpretation of Woodcock Johnson III achievement tests (WJ-III), as well as her solicitation of and review of information provided by E.P.'s teachers through emails or direct conversations. ECF 16, Decision, ¶ 22. According to the ALJ, "The WJ-III is a 'gold standard' assessment that looks at a student's educational ability in the areas of reading, writing, and math performance according to the student's age. It provides an accurate and complete assessment of a student's educational ability and is widely used for assessing a student's educational performance." *Id.* ¶ 23. Bosse compared E.P.'s performance on the WJ-III with the reports she obtained from his teachers. *Id.*

The Educational Assessment summarized E.P.'s performance on the WJ-III tests and the reports from E.P.'s teachers. ECF 16, Educational Assessment, at 1. Bosse concluded that E.P. did not demonstrate difficulty in an area of educational performance. *Id.* at 4.

In particular, E.P. achieved a Standard Score of 118 in "Broad Reading Cluster", which is in the high average range of achievement for a student E.P.'s age. *Id.* at 2. Bosse noted that E.P.'s reading teacher reported that E.P. was "performing above grade level for reading"; his work is "thoughtful and well-done"; and he was "meeting grade level expectations for assignments." *Id.* The results of the "Board Mathematics Cluster" revealed that E.P.'s performance was in the average range of achievement (Standard Score of 96). *Id.* However, in one subtest, math fluency, E.P. received a Standard Score of 82, which is in the low-average range. *Id.* at 4; *see also* ECF 16, Decision, ¶ 28. E.P.'s math teacher reported that E.P. was performing at grade level in math. ECF 16, Educational Assessment, at 3. Although the teacher indicated that E.P. does not always turn in his homework, the teacher noted that he is "always willing and able to complete it when he is given extra time." *Id.* The results of the "Broad Written Language Cluster" placed E.P. in the average range of achievement (Standard Score of

99). *Id.* E.P.'s writing teacher reported that E.P. was performing at grade level for written language, but that some instruction is required to help him determine where paragraphs should begin and end. *Id.*

## B. Psychological Assessment

Celauro has worked as a psychologist at the School since July 2013. ECF 16, Decision, ¶ 36. She previously worked for a year as a school psychologist in P.G. County. *Id.* She holds a Bachelor of Science in Psychology and has an Education Specialist ("Ed. S.") degree in school psychology. *Id.* ¶ 37. Celauro's graduate school courses included, *inter alia*, cognitive assessment, academic achievement assessments, and the administration of various educational assessment tests. *Id.* ¶¶ 38, 39. She is certified as a school psychologist in Maryland, and she is also a nationally certified school psychologist. *Id.* ¶ 40. Celauro has conducted between 75 and 100 psychological evaluations during the course of her employment with HCPSS and P.G. County. *Id.*

As part of Celauro's assessment of E.P., she reviewed E.P.'s educational history and educational records, including his 504 Plan and accommodations, attendance history, grade history, comments on report cards, progress reports, and records provided by P.G. County. *Id.* ¶ 42. She also conducted classroom observations and obtained input from E.P.'s teachers and his mother. *Id.* ¶¶ 42, 50, 70, 74-76. In addition, Celauro administered four standardized tests. *Id.* ¶ 44. These included the Wechsler Intelligence Scale for Children Fourth Edition ("WISC-IV"), which the ALJ characterized as "one of the most reliable and valid measures of a student's cognitive ability"; the Behavior Assessment System for Children Second Edition ("BASC-2"), an assessment system that utilizes parent and teacher rating scales to assess a student's behavior and social-emotional strengths and weaknesses; the Conners 3, "a narrower measure that looks

specifically at behaviors associated with ADHD," and is correlated with the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition; and the Behavior Rating Inventory of Executive Function ("BRIEF"), which utilizes a rating scale completed by parents and teachers to analyze a student's executive functioning skills. *Id.* ¶¶ 44, 47-50.

Celauro selected the four tests because she has found them to be "sound, reliable, valid measures of the necessary rating scales." *Id.* ¶ 51. In addition, she selected the particular tests because "they were geared" to E.P.'s "suspected areas of disability identified by the IEP team . . . due to ADHD." *Id.* ¶ 52.

In the Psychological Assessment, Celauro summarized the results of the various tests, her classroom observations, and the teacher reports. ECF 16, Psychological Assessment. She also provided background information regarding E.P. *Id.* The report indicates that E.P. received the following grades in his first quarter of his second sixth grade year: B in English Language Arts; C in Math; C in Science; B in Geography; and C in Reading Seminar. *Id.* at 1. In the classroom, Celauro observed E.P. "to be somewhat inattentive, especially when he did not have an assignment in front of him." *Id.* at 7. But, she noted that, "[w]hen he was engaged in [a] class activity… he was able to meaningfully participate." *Id.*

Celauro concluded that E.P.'s overall cognitive ability, as measured by WISC-IV, fell in the superior range of functioning as compared to his peers. ECF 16, Psychological Assessment, at 7. In particular, E.P. was found to have a Full Scale IQ of 120. *Id.* at 4. E.P.'s score on two out of the four indices that comprise the overall IQ score - verbal comprehension and working memory - also fell in the superior range. *Id.* E.P.'s score in the perceptual reasoning index fell in the high average range. *Id.* But, E.P. demonstrated a significant weakness in the area of processing speed. *Id.* at 4-5; *see also* ECF 16, Decision, ¶ 65. E.P. attained a score of 85, which

falls in the low average range of functioning as compared to his peers. ECF 16, Psychological Assessment, at 4. According to Celauro, the "large difference" between E.P.'s processing speed score and his scores in other areas only occurs in 0.5-1% of the population. *Id.* at 5. Celauro determined: "This weakness can be classified as a deficit in his processing skills." *Id.* She also found that there were concerns in E.P.'s behavior ratings in the areas of inattention, working memory, and some organization. *Id.* at 7; *see also* ECF 16, Decision, ¶¶ 62, 73. In her view, these ratings were consistent with E.P.'s diagnosis of ADHD. ECF 16, Psychological Assessment, at 7; *see also* ECF 16, Decision, ¶ 62.

### C. HCPSS Evaluation and Determination of Non-Eligibility for an IEP

The Evaluation did not contain a recommendation or a finding regarding E.P.'s eligibility under IDEA. ECF 16, Educational Assessment; ECF 16, Psychological Assessment. On December 2, 2014, on the basis of the reports described above, E.P.'s IEP team determined that E.P. was not eligible under the IDEA to receive special education services. ECF 16, Decision, ¶ 89; ECF 16, Evaluation Report Specific Learning Disability Supplement, at 2-3; ECF 16, IEP Team Meeting Report, at 2. In particular, the IEP team concluded that although E.P. has "a disability of Other Health Impairment", it does not impact his education. ECF 16, IEP Team Meeting Report, at 2. However, the IEP team recommended that E.P. receive "checking for understanding, extra time to process directions, and chunk assignments/rubric to support his organization." *Id.* In addition, the team recommended that E.P. and his family "should advocate for extra time as needed." *Id.*

The Parents regard the Evaluation as "inadequate and inappropriate . . . ." ECF 2, ¶ 16. In particular, they claim that it failed to evaluate E.P. "in all areas of suspected disability." *Id.* And, they disagree with the determination of non-eligibility for services under the IDEA. *Id.* ¶

17. By letter dated March 31, 2015, the Parents, through counsel, requested an IEE, including "neuropsychological testing and a Functional Behavior Assessment…." *Id.* HCPSS denied the request and, on May 4, 2015, pursuant to 34 C.F.R. § 300.502(b)(2)(i)-(ii), it filed a due process complaint to defend its evaluation. *Id.*; ECF 16, Decision, at 1.

### D. The Decision

HCPSS's due process complaint was considered by ALJ Douglas E. Koteen at hearings held on June 6, June 26, and July 7, 2015. ECF 16, Decision, at 3. The ALJ considered two issues: whether the Evaluation was appropriate and, if not, whether HCPSS should be required to pay for an IEE of the student at public expense. *Id.* As indicated, the ALJ did not address the IEP team's determination of non-eligibility for special education services under the IDEA.

The ALJ heard testimony and considered numerous exhibits offered by HCPSS and plaintiffs. *Id.* at 4-5. Bosse and Celauro were received as experts for HCPSS in the fields of special education and school psychology, respectively, and Stephan M. Silverman, Ph.D., School Psychologist, was received as an expert witness for plaintiffs in school psychology and the assessment of children with disabilities. ECF 16, Decision, at 5. However, Dr. Silverman did not conduct an IEE of E.P. or author a report.[7]

On August 6, 2015, the ALJ issued a comprehensive, thorough Decision, 56 pages in length, with 89 paragraphs of findings of fact. ECF 16, Decision. He concluded that the

---

[7] As noted, it was only *after* plaintiffs were unsuccessful at the administrative hearing that they asked Dr. Levisohn to evaluate E.P. Dr. Levisohn conducted her evaluation of E.P. in October and November 2015, and she issued her Report in March 2016. As discussed in my Memorandum Opinion of October 25, 2016 (ECF 21), denying plaintiffs' motion to supplement the record with that Report, "[p]laintiffs made a tactical decision not to obtain the Report for use at the administrative hearing." *Id.* at 18. Although "plaintiffs' decision may have been influenced by financial concerns….to the extent that the Report was unavailable to the ALJ, it was because of a strategic decision made by the plaintiffs." *Id.*

Evaluation of E.P. was appropriate. Accordingly, he determined that E.P. was not entitled to an IEE at public expense under 20 U.S.C. §1415(b)(1). ECF 16, Decision at 56.

In reaching his decision, the ALJ found that the "evaluators testified credibly and in detail regarding the assessments they administered, the reasons they chose the instruments they used, the basis for the information they included, and why certain information was not included." *Id.* at 55. The ALJ acknowledged that "certain information" was "not included" in the assessments. *Id.* But, he determined that "HCPS[S] proved that both the Education and Psychological Assessments included the information that was required for an appropriate assessment, and the Parents did not show that any information they claimed was not included was required to be present for an appropriate evaluation under federal or State law." *Id.*

In particular, the ALJ determined that HCPSS "used a variety of technically sound assessment tools and strategies to gather relevant functional, developmental, physical and academic information regarding [E.P.]" *Id.* ¶ 53. He also found that the "tools" utilized by HCPSS "assessed the relative contribution of cognitive and behavioral factors", and "assisted the IEP team in determining whether [E.P.] was a student with a disability under IDEA." *Id.* And, as to the Psychological Assessment, the ALJ found that the "instruments used by Celauro…were tailored to assess [E.P.'s] specific areas of educational need and were not designed to provide only a single general intelligence quotient." *Id.* ¶ 55.

The ALJ also determined that the appropriateness of Celauro's Functional Behavior Assessment was "outside the scope of issues to be addressed" by him because the issue was not raised in HCPSS's due process complaint, and because the FBA was not used to determine E.P.'s eligibility for special education and related services. *Id.* at 54. The ALJ reasoned, in part, *id.* at 53-54 (emphasis added):

HCPS[S] filed a due process hearing request in this case in accordance with IDEA procedures to establish that the Educational and Psychological Assessments conducted by HCPS[S] in November 2014 were appropriate. The HCPS[S] hearing request made no reference to the FBA. A Telephone Prehearing Conference was conducted on May 26, 2015, and I issued a Prehearing Conference Report and Order (Report) on May 27, 2015. In that Report, I identified the issues as follows:

> The issues are whether the educational and psychological evaluations conducted by HCPS[S] in November 2014 are appropriate, and whether the Parents are entitled to an IEE at public expense.

**The Report afforded the parties five days to file a motion to correct that document. The Parents did not file such motion and, therefore, have waived any other claims in this proceeding.** Moreover, by not requesting that the issues identified in the Report be corrected, the Parents failed to place HCPS[S] on notice that the appropriateness of the FBA was an issue to be litigated in this proceeding. **Accordingly, I conclude that the only issues in this proceeding are the appropriateness of the Educational and Psychological Assessments conducted by HCPS[S] staff in November 2014, and whether the Parents are entitled to obtain an IEE at public expense. The question of whether the FBA conducted by HCPS[S] was appropriate or thorough is outside the scope of the issues to be addressed in this decision.**

Further, the ALJ said, *id.* at 56 (emphasis in original):

> While the Parents may disagree with some of the conclusions in the Assessments, and may disagree with subsequent decisions made by the IEP team after the assessments were completed and considered, these disagreements do not render the Assessments themselves inappropriate….
>
> As noted above, the critical question before me is not the *results* of the HCPS testing, or any actions taken by the IEP team after the Assessments were considered, but whether the Assessments were properly administered in accordance with the standards and requirements set forth above. It is important to note that the applicable legal issues in this proceeding, which resulted from the due process complaint filed by the school system, do not involve a determination of whether the Student has an educational disability or whether he is eligible for special education and services. In this case, HCPS[S] has established that the Educational and Psychological Assessments conducted by HCPS were proper, comprehensive and in compliance with applicable law.

On December 4, 2015, plaintiffs filed suit in this Court, pursuant to 20 U.S.C. § 1415(i),

seeking reversal of the ALJ's decision. *See* ECF 1.

Additional facts are included in the Discussion.

## IV.     Discussion

In their Motion, plaintiffs claim that the ALJ's finding that the HCPSS Evaluation was appropriate "is legally baseless and factually incorrect." ECF 30 at 8.  In particular, they assert that the HCPSS Evaluation "did not, as specifically required by IDEA, make any determination whether E.P. was a child with a disability and eligible under IDEA to receive Special Education." *Id.*  In addition, they argue that the Evaluation "failed to comprehensively evaluate E.P. in all areas of suspected disability and improperly evaluated E.P. for a suspected Specific Learning Disability using an inappropriate methodology." *Id.*

Plaintiffs also raise procedural arguments.  In particular, they contend that the ALJ "made *numerous* evidentiary rulings that were extremely prejudicial to the Family…." *Id.* at 7 (emphasis in original).  According to plaintiffs, the ALJ "incorrectly quashed subpoenas for various witnesses employed by HCPSS who possessed "critical, highly probative evidence." *Id.* In addition, plaintiffs maintain that the ALJ improperly allowed HCPSS to introduce a "previously undisclosed Reevaluation Report" prepared by Dr. Silverman, "without parental consent, of an **unrelated student** that the Family's expert witness, Dr. Stephan M. Silverman, performed as a school system psychologist in **2006.**" *Id.* (emphases in original).

### A.  Procedural Issues

#### 1.  Subpoenas

The Parents requested subpoenas for Andrea Portney, E.P.'s Section 504 case manager/counselor; Patricia Daley, HCPSS's Director of Special Education for HCPSS; and three teachers: Constantia Seas, E.P.'s Math Teacher; Samuel Lehnerd, E.P.'s Geography/World Cultures Teacher; and Hadley Schmitt, E.P.'s Physical Education Teacher. ECF 16, Decision at 5

n.5.  HCPSS moved to quash the subpoenas, which the Parents opposed.  *Id.*  The ALJ granted HCPSS's motion and quashed the witness subpoenas.  *Id.*[8]

As to Daley, the ALJ quashed the subpoena on the ground that Daley "had no relevant testimony to provide regarding the narrow issues that were the subject of this hearing."  ECF 16, Decision, at 5 n. 5; *see also* ECF 16, Hrg. Tr. at 250, 252 (June 6, 2015).  And, he quashed the remaining witness subpoenas because the Parents "failed to demonstrate that these witnesses had relevant information that was not duplicative, and that was not based on mere speculation."  ECF 16, Decision, at 5 n. 5.  At the hearing, the ALJ orally explained, ECF 16, Hrg. Tr. 342:2-344:9 (June 26, 2015):

> I don't intend to use this hearing as your opportunity for discovery. You have an opportunity to contact people to see if they have information to determine what you want to do in the hearing.
>
> The teachers are the teachers of these parents' child and you haven't identified any issues.
>
> You said we need to determine whether Ms. Bosse accurately reported the input that she got. We've got one email[9] and it looks like she accurately reported the input that she got. In fact, it was almost verbatim.
>
> And you told us that you haven't talked to them and you don't know and you're looking for things. And I'm not going to allow you to present witnesses that you have no specific evidence from to establish that I know that there is a misrepresentation or incompleteness and it hasn't been done and I want you to hear it.
>
> You told us that you don't know and you're just looking and I don't find that that is necessary for material for this hearing. And so I'm quashing the subpoenas for the three teachers.

---

[8] The ALJ denied a portion of HCPSS's motion to quash the Parents' subpoena *duces tecum*.  That ruling is not in issue.

[9] The ALJ was referring to an email dated November 25, 2014, from Ms. Seas to Bosse, produced in response to plaintiffs' subpoena for documents involving teacher input for the Educational Assessment and the classroom observations for the Psychological Assessment. In the email, Seas provided her view of E.P.'s level of functioning in her math class.  ECF 32-2 at 9.

***

You haven't identified any specific issues and I'm not – don't think it's appropriate for me to just let you put people on the witness stand and you have no idea what they're going to say and you're theorizing that she did -- that Ms. Bosse did something wrong. You had an opportunity to cross-examine Ms. Bosse. You didn't go into details about each individual teacher.

They looked for the documents. They provided the documents that they found. And the document we got leads me to believe that she very accurately reported what she obtained.

So I don't see any issue that relates to an identified issue other than pure speculation which you generally admitted because you say you haven't talked to these people. I don't see a reason for them.

Ms. Seas' subpoena is quashed; Mr. Leonard's subpoena is quashed . . . Ms. Schmitt's subpoena is quashed. I don't know what is the need for a 504 case manager to testify about her involvement with a child without any identified particular issues or conflicts.

We have [Alyson Celauro, HCPSS school psychologist, who prepared the Psychological Assessment dated November 25, 2014,] here who, apparently, was the supervisor of the 504 case managers who's presumably going to testify in detail and you can question her on those kinds of issues in addition to whatever Mr. Krew questions her about with regard to her evaluation.

This case is about two evaluations and whether they're appropriate, and a lot of what you're arguing, I think, would be perfectly appropriate in a different case where you filed the hearing request and were trying to establish a denial of FAPE or a misidentification, but that's not really what this case is about. So those subpoenas are quashed.

Plaintiffs argue that the ALJ incorrectly quashed the witness subpoenas. ECF 30 at 7, 15.

According to plaintiffs, the witnesses "possessed critical, highly probative evidence." *Id.* at 7.

Plaintiffs explain, *id.*: "These witnesses worked directly with E.P. and would have supplied

obviously relevant firsthand eyewitness evidence regarding his educational functioning in their

classrooms, which should have been considered as part of a comprehensive special education

evaluation."

As to HCPSS School Counselor Portnoy, who acted as E.P.'s Section 504 Case Manager, plaintiffs assert that because "Portnoy had direct, personal knowledge regarding E.P. and clearly possessed relevant information regarding E.P.'s needs at the time the evaluation was conducted….her testimony would have been relevant to the issue of whether the Evaluation Report comprehensively evaluated E.P. in all areas of suspected need, as required by IDEA." ECF 30 at 18. As to Daley, HCPSS's Director of Special Education, plaintiffs claim that her "testimony…would have shed valuable light on whether E.P.'s evaluation was conducted appropriately and consistent with HCPSS's own protocols, as well as federal and state statutory and regulatory requirements." *Id.*

With respect to the three teachers, plaintiffs claim that Celauro and Bosse received input from the teachers during the course of their assessments, and the information received by the teachers was incorporated into the assessments. Therefore, plaintiffs insist that testimony from these teachers was "critical to explore whether these teachers possessed relevant information that a) was *not* incorporated into the Evaluation Report, b) was inaccurately reported by Ms. Celauro or Ms. Bosse, or c) would reveal the depth of knowledge those teachers possessed regarding E.P." *Id.* at 16 (emphasis in original); *see also* ECF 34 at 6-7.

Plaintiffs also maintain that the ALJ improperly concluded that input from E.P.'s teachers was "accurately reflected in the Evaluation Report, so there was no need for the Parents to question those teachers at the hearing." ECF 30 at 16. Plaintiffs explain, *id.* (emphases in original):

> The ALJ improperly based his decision to bar the testimony of the three teachers on an email from Ms. Seas to Ms. Bosse that reported E.P.'s current functioning in math, which was produced in response to Parents' subpoena duces tecum, and which was not made a part of the administrative record….ALJ Koteen found that this *single* email- the only one produced in response to the subpoena- indicated that the email's information was accurately reflected in the Evaluation

Report. Based on that single piece of written information - unchallenged by cross-examination- the ALJ concluded, with no proof whatsoever, that the input regarding E.P. from the *three* teachers at issue was, without exception, accurately reflected in the Evaluation Report….

Further, plaintiffs complain that the ALJ improperly quashed the witness subpoenas "on the ground that the Parents' attorney had not 'spoken' with them regarding their expected testimony, even though HCPSS's attorney made clear that he would not have permitted those witnesses to speak with the Family's attorneys, because they were 'agents' of his client, HCPSS." ECF 30 at 7; *see also id.* at 17. They also contend that "[t]he ALJ…erred in quashing the subpoenas on the basis that, in his view, the Family's counsel did not set forth a sufficient proffer of evidence about the specifics of the witnesses' expected testimony," given that HCPSS's attorney did not permit plaintiffs' counsel to speak to these witnesses regarding their testimony. *Id.* at 17.

HCPSS counters that the question of whether to quash a subpoena is committed to the discretion of the ALJ, and plaintiffs "have presented no evidence that ALJ Koteen abused his discretion in quashing the subpoenas." ECF 32-1 at 9. In their view, plaintiffs have "present[ed] nothing more than the same arguments that were presented to and rejected by ALJ Koteen." *Id.* Defendants assert, ECF 35 at 5:

> The Parents are…incorrect in their assertion that ALJ Koteen granted the School Board's motion to quash as a result of their failure to talk to E.P.'s teachers. As found by Judge Koteen, he quashed the subpoenas "because the Parents failed to demonstrate that these witnesses had relevant information that was not duplicative, and that was not based on mere speculation." *ALJ Decision* at 5 n.5. His reasons for quashing the subpoenas relied on more than the fact that the Parents' attorneys did not speak with E.P.'s teachers. To this day, the Parents are unable to present anything more than mere speculation as to what E.P.'s teachers might have testified. Nor are they able to refute ALJ Koteen's conclusion that their testimony would have been duplicative of "information requested [by the Parents that] was previously disclosed by HCPS[S] with the Student's educational record or its five-day disclosure [and] was within the Parents' control or possession . . . ." *Id.*

HCPSS acknowledges that plaintiffs' counsel would not have been permitted to speak to the subpoenaed witnesses. ECF 35 at 3-4 & 4 n. 1. But, they assert: "The Parents were in no way prohibited from speaking to their child's teachers with regard to his educational functioning and providing testimony regarding those conversations at the hearing….The Parents apparently chose not to speak with E.P.'s teachers about his classroom performance or, at a minimum, no such testimony was elicited from them." *Id.* at 4. In addition, defendants maintain that there is no merit to plaintiffs' argument that the testimony of the teachers was necessary to ascertain whether Bosse accurately reported teacher-input. They explain that, "based upon the available evidence and his opportunity to observe Ms. Bosse on the witness stand, [the ALJ] determined that she accurately reported teacher input regarding E.P.'s classroom functioning in her Educational Assessment, and that credibility determination should not be disturbed." *Id.* at 5.

The IDEA states, in relevant part, that "a party to a [due process] hearing ... shall be accorded ... the right to present evidence and confront, cross-examine, and compel the attendance of witnesses." 20 U.S.C. § 1415(h)(2). The controlling federal regulation guarantees parents the right to present both evidence and witnesses at a due process hearing. 34 C.F.R. § 300.512(a)(2) (stating that a party to a due process hearing "has the right to ... present evidence and confront, cross-examine, and compel the attendance of witnesses").

Under Maryland law, at an administrative hearing, the ALJ "may admit probative evidence that reasonable and prudent individuals commonly accept in the conduct of their affairs and give probative effect to that evidence." S.G. § 10-213(b). Conversely, the ALJ "may exclude evidence" that is "incompetent", "irrelevant", "immaterial", or "unduly repetitious." S.G. § 10-213(d). But, "[e]vidence may not be excluded solely on the basis that it is hearsay." S.G. § 10-213(c).

In addition, as noted by defendants, "[e]nforcement of a pretrial subpoena duces tecum must necessarily be committed to the sound discretion of the trial court since the necessity for the subpoena most often turns upon a determination of factual issues." *United States v. Nixon*, 418 U.S. 683, 702 (1974). And, an impartial hearing officer has "inherent authority to manage hearings to avoid needless waste and delay.'" *B.G.*, 2017 WL 1049466, at *11 (citation omitted).

"IDEA due process hearings that afford the parties the procedural safeguards contained within the IDEA and its implementing regulations, satisfy constitutional due process requirements." *S.W. v. Florham Park Bd. of Educ.*, No. CV 15-7842 (MAH), 2017 WL 2267263, at *7 (D.N.J. May 24, 2017), appeal filed, Case. No. 17-2329 (June 20, 2017). As noted, "[p]rocedural violations committed by the hearing officer at a due process hearing only violate the IDEA if they 'result in the loss of educational opportunity.'" *B.G.*, 2017 WL 1049466, at *11 (citation omitted).

As indicated, plaintiffs argue that the testimony of the teachers was necessary to ascertain what information the teachers provided to the evaluators and whether Bosse accurately reported the input she received from teachers. Although plaintiffs protest that they were unable to proffer any specific information regarding the witnesses' expected testimony because their counsel would not have been permitted to confer with witnesses, the ALJ confirmed with counsel for HCPSS that the *Parents themselves* were free to contact E.P's teachers. ECF 16, Hrg. Tr. 346:25-347:6 (June 26, 2015). The ALJ also said, *id.* at 347:14-19: "I didn't hear efforts to [contact the subpoenaed witnesses] that were rebuffed. I didn't hear that a letter was written to try and contact them and they wouldn't let us. I didn't hear any of that. All I heard was we're guessing and maybe there are some issues and then we got an email that seemed to refute that issue that she wasn't being accurate." Moreover, as noted by the ALJ, plaintiffs did not cross-

examine Bosse regarding her conversations with the individual teachers.  ECF 16, Hrg. Tr. 343:4-6 (June 26, 2015).

It is also noteworthy that at the hearing on June 26, 2015, the ALJ "denied a portion of [HCPSS's] motion to quash the subpoena *duces tecum* related to documents involving teacher input for the Educational Assessment and classroom observations for the Psychological Assessment." ECF 16, Decision, at 5 n. 5. Thus, to the extent that documents existed from E.P.'s classroom teachers related to teacher input for the two assessments, the ALJ ordered that plaintiffs were entitled to them.  The document production included an email from Seas, E.P.'s math teacher, to Bosse, dated November 25, 2014, regarding E.P.'s performance in math class. Upon review of the email, the ALJ determined that Bosse accurately reported the information she obtained because the information from the email was included "almost verbatim" in her Educational Assessment.  ECF 16, Hrg. Tr. 342:11 (June 26, 2015).

Thus, based upon the available evidence and the ALJ's opportunity to observe Bosse on the witness stand, the ALJ stated that plaintiffs "provided no evidence to support the claim that Bosse's report did not accurately report" the information she obtained from E.P.'s teachers regarding his classroom performance.  Decision, at 33.  As discussed, *supra*, "Courts should be particularly hesitant to disturb the 'ALJ's determinations of the credibility of witnesses' as 'the fact-finder, who has the advantage of hearing the witnesses, is in the best position to assess credibility.'" *T.B.*, 2016 WL 7235661, at *5 (quoting *Wagner,* 340 F. Supp. 2d at 611); *see also Doyle*, 953 F.2d at 104.

As the ALJ determined, there were only two issues for his resolution: whether the HCPSS Evaluation was appropriate and, if not, whether HCPSS should be required to pay for an IEE for E.P., at public expense.  ECF 16, Decision, at 3.  The Parents did not ask the ALJ to

consider the IEP team's determination that EP was not eligible for special education services under the IDEA, and that issue was not raised by HCPSS in its due process complaint concerning the Evaluation, filed pursuant to 34 C.F.R. § 300.502(b)(2)(i)-(ii). The IEP team's eligibility determination is not relevant to the question of whether the HCPSS Evaluation was appropriate. And, the Parents did not file a due process complaint under 34 C.F.R. § 300.507 to establish the improper denial of a FAPE, or to demonstrate that E.P. was improperly found ineligible for special education services. *Id.* (Permitting "a parent or a public agency [to] file a due process complaint on any of the matters described in § 300.503(a)(1) and (2) (relating to the identification, evaluation or educational placement of a child with a disability, or the provision of FAPE to the child)"). As discussed, *infra*, the question of whether the Evaluation was appropriate turns on whether the proper methodologies were utilized, rather than the results or conclusions of the two assessments. *See L.S. ex rel. K.S. v. Abington Sch. Dist.*, No. CIV. 06-5172, 2007 WL 2851268, at *12 (E.D. Pa. Sept. 28, 2007).

E.P.'s teachers, his Section 504 Case Manager, and HCPSS's Director of Special Education did not author the assessments in question. As discussed by the ALJ, testimony from these witnesses might have been relevant in a case in which the Parents filed a due process complaint to establish the denial of a FAPE or in a case evaluating whether E.P. should have been found eligible for special education services. *See* 34 C.F.R. § 300.507. The testimony did not appear relevant to the narrow question of whether the Evaluation was appropriate. Moreover, the Parents could have spoken to the teachers and related what they learned, as the strict rules of evidence do not apply. *See* S.G. § 10-213(c) ("Evidence may not be excluded [at an administrative hearing] solely on the basis that it is hearsay."). In my view, the ALJ did not err or abuse his discretion in quashing the subpoenas.

Plaintiffs have not provided any specific information regarding the proposed testimony of the witnesses. They have failed to demonstrate that, to the extent the ALJ committed a procedural violation, it was one that "'result[e] in the loss of educational opportunity.'" *B.G.*, 2017 WL 1049466, at *11 (citation omitted).

## 2. Silverman Report

The Parents presented the testimony of Stephan Silverman, who testified as an expert in school psychology and the assessment of children with disabilities. ECF 16, Decision, at 43. During cross-examination of Dr. Silverman on July 7, 2015, over the objection of counsel for Parents, the ALJ allowed HCPSS to introduce into evidence a redacted Reevaluation Report, prepared in 2006 by Dr. Silverman in his capacity as a school psychologist for an unrelated student at a Montgomery County public school ("MCPS"). ECF 16, Hrg. Tr. at 638-700 (July 7, 2015).

In his testimony or direct examination, Silverman was critical of Celauro's report, claiming it was "not comprehensive and was incomplete . . . .", for various reasons. ECF 16, Decision, at 47. After Dr. Silverman's testimony on direct examination, defense counsel stated to the ALJ, as follows, ECG 16, Hrg. Tr. at 641:10-20 (July 7, 2015):

> Dr. Silverman…is here to testify about what constitutes an appropriate report, what the standards are, what the general process should be; and I am giving your honor a report which will show that there was no parent interview, there was no child interview, there's no interpretation of any data, he just gives test scores….I think that it undercuts his credibility as an expert in this case and it goes to his credibility.

The ALJ ruled, in part, ECF 16, Hrg. Tr. at 650:18-22: "I find that [the 2006 report is] relevant to issues of credibility and impeachment of the expert and, therefore, I am allowing it and it includes a representation that all identifying information has been redacted."

On cross-examination, counsel for HCPSS questioned Dr. Silverman extensively regarding the Reevaluation Report. *Id.* at 638-700. In particular, he endeavored to impeach Dr. Silverman by illustrating the contrast between Dr. Silverman's testimony regarding the general procedures to be utilized in conducting an appropriate psychological assessment and the procedures utilized by Dr. Silverman in preparing the Reevaluation Report. *Id.* at 641.

Plaintiffs contend that the ALJ erred by admitting the Reevaluation Report. ECF 30 at 19. They maintain that the report "was utterly irrelevant to any issue at the hearing, including Dr. Silverman's credibility as an expert witness." *Id.* at 21. Plaintiffs explain, *id.* at 21-22 (emphasis and alterations in original):

> Dr. Silverman testified clearly that the 2006 reevaluation was performed in an entirely different context than the *initial* evaluation of E.P. He testified that the child he reevaluated in 2006 was previously identified as an eligible student under IDEA, that the child had previously undergone a comprehensive initial evaluation, and that Dr. Silverman's 2006 reevaluation of the student necessarily contained less information regarding the student than an initial evaluation because the child's IEP team had already possessed thorough and comprehensive information about the child. (N.T. 661-662,672,677, 683). Moreover, the child at issue was not even attending a public school, but due to the student's disabilities, attended a private school for a number of years (N.T. 745; Board Ex. 12 at 5) where the child's educational progress was continuously monitored. "This [the child reevaluated in 2006] is a more or less thoroughly known child who is already in a small program for years. This [E.P.] is a child that we don't know anything about." (N.T. 683). Thus, it was entirely improper for the ALJ to allow the admission of the 2006 Reevaluation Report even for HCPSS's ostensible purpose- to impeach the expert testimony of Dr. Silverman- because nothing about this nearly decade-old, unrelated report was at all relevant to Dr. Silverman's testimony regarding the appropriateness of HCPSS's 2014 Evaluation Report of E.P.

Plaintiffs acknowledge that the ALJ "ostensibl[y]" admitted the Reevaluation Report for purposes of impeachment. ECF 30 at 19. But, they maintain that the ALJ impermissibly relied on the report with respect to the substantive issue of the appropriateness of the HCPSS Evaluation. *Id.*; *see also id.* at 22-23. According to plaintiffs, "the ALJ…found HCPSS's 2014

evaluation of E.P. to be appropriate by *comparing it* to the unrelated and irrelevant 2006 Reevaluation Report….Indeed, he specifically found that …Celauro 'prepared a more detailed and insightful report than Silverman....'" *Id.* at 22-23 (emphasis in original) (quoting ECF 16, Decision, at 48).

In addition, plaintiffs complain that the Reevaluation Report was untimely disclosed, in contravention of what is known as the five-day rule. ECF 30 at 21. It requires evidence to be disclosed to the opposing party at least five business days prior to the start of an administrative hearing under IDEA. 20 U.S.C. §1415(f)(2); 34 C.F.R. § 300.512).[10]

In response, defendants contend that the ALJ "cogently addressed the Parents' argument regarding the comparability of Dr. Silverman's 2006 report with Ms. Celaruo's [sic] 2014 report." ECF 32-1 at 17 (citing ECF 16, Decision at 47-48). Defendants also note that the ALJ based his credibility determination regarding Dr. Silverman "on more than Dr. Silverman's 2006 assessment report alone." ECF 32-1 at 20 (citing ECF 16, Decision at 44); *see also* ECF 16, Decision at 44 (stating that "Silverman's testimony demonstrated that he was not familiar with the diagnostic questions set forth in the Referral section of Celauro's Assessment, which identified the diagnostic questions that the Assessment was designed to address, as to whether [E.P.] meets the criteria for an educational disability of SLD or OHI due to ADHD."). Defendants emphasize that "[a]n administrative fact-finder's credibility determinations are not a proper subject of appeal." ECF 32-1 at 19.

---

[10] Plaintiffs also contend that counsel for HCPSS violated the Family Education Rights and Privacy Act, 20 U.S.C. § 1232g, 34 C.F.R. Part 99 ("FERPA"), by offering the Reevaluation Report without the consent of the parents of the subject child. ECF 30 at 20. As noted by the ALJ, this is not a proceeding regarding FERPA. ECF 16, Hrg. Tr. 645-646 (July 7, 2015). Moreover, it is not clear under what authority plaintiffs could assert the privacy rights of an unnamed student. In any event, the Reevaluation Report was redacted to protect any identifying information. Accordingly, I will not address this argument.

Defendants also argue that as to the five-day rule the applicable "statute and the regulation vest the administrative fact-finder with complete discretion with regard to whether or not to bar an evaluation that was not disclosed at least five days prior to the hearing." ECF 32-1 at 18; *see also* ECF 35 at 6-9. According to defendants, the ALJ properly exercised his discretion by permitting HCPSS to offer Dr. Silverman's report during cross-examination, particularly because in their evidence disclosure letters, both plaintiffs and HCPSS reserved the right to offer into evidence documents to be used for impeachment purposes. ECF 35 at 10.

Plaintiffs disagree that the ALJ has discretion under the applicable statutes and regulations to admit evidence that violates the five-day rule. But, even if the ALJ had such discretion, plaintiffs claim that the ALJ "*abused* that discretion…." ECF 34 at 13 (emphasis in original). According to plaintiffs, HCPSS's failure to comply with the five-day rule "was a deliberate, strategic *choice* to entirely flout the applicable regulation and not disclose the 2006 report *at all,* such that Dr. Silverman and Plaintiffs' counsel would not be prepared for its admission." *Id.* at 14-15 (emphasis in original). In plaintiffs' view, they were "very clearly prejudiced both by the deliberate non-disclosure of the 2006 report, and the fact of its admission. The late disclosure left Dr. Silverman with no opportunity to review the report in advance, to review other materials in his possession regarding the unnamed child who was the subject of the 2006 reevaluation report, or to discuss the report with the Family's counsel.[]" *Id.* at 16.

### a. Five-Day Rule

"The 'five-day rule' requires parties to disclose evaluations they plan on using at the hearing to all other parties at least five business days prior to a hearing." *Taylor ex rel. Dolch v. Sandusky*, No. CIV. CCB-04-301, 2005 WL 524586, at *4 n. 5 (D. Md. Mar. 4, 2005) (citing 20

U.S.C. 1415(f)(2)(A)).  Section 1415(f)(2) of 20 U.S.C. provides, in relevant part (emphasis added):

> (A) In general
> Not less than 5 business days prior to a hearing conducted pursuant to paragraph (1), each party shall disclose to all other parties all evaluations completed by that date, and recommendations based on the offering party's evaluations, that the party intends to use at the hearing.

> B) Failure to disclose
> A hearing officer *may* bar any party that fails to comply with subparagraph (A) from introducing the relevant evaluation or recommendation at the hearing without the consent of the other party.

34 C.F.R. §300.512(b) is also relevant.  It states (emphasis added):

> (1) At least five business days prior to a hearing conducted pursuant to §300.511(a), each party must disclose to all other parties all evaluations completed by that date and recommendations based on the offering party's evaluations that the party intends to use at the hearing.

> (2) A hearing officer *may* bar any party that fails to comply with paragraph (b)(1) of this section from introducing the relevant evaluation or recommendation at the hearing without the consent of the other party.

And, 34 C.F.R. §300.512(a)(3) grants any party the right to "[p]rohibit the introduction of any evidence at the hearing that has not been disclosed to that party at least five business days before the hearing[.]"

At the hearing, counsel for HCPSS explained the reason he did not comply with the five-day rule as to the 2006 Silverman report.  Due to its confidential nature, counsel said he "would not have disclosed it without knowing that it was going to be relevant and it became relevant when two things happened, number one, [Dr. Silverman] told you his general practice and, number two, [plaintiffs' counsel] brought up practice in Montgomery County." ECF 16, Hrg. Tr. 642:6-9 (July 7, 2015).  After hearing argument from counsel for both sides, the ALJ said, *id.* at 642:14-20:  "He's got a right to present documents on cross based on what happened on direct

testimony and I think both of you made references to that in your disclosures and he's got a right to do that and it doesn't have to comply with the five-day rule if he's responding to something that was said on direct." *Id.* The ALJ also said, *id.* at 650:14-18: "I am allowing it over your objection based on the fact that it was provided in response to testimony on direct, so I find that under those circumstances, limited circumstances it does not need to meet the five-day rule."

In my view, both the statute and applicable regulation vest the ALJ with discretion with regard to the decision of whether to bar use of an evaluation that was not disclosed at least five days prior to the hearing. *See* 20 U.S.C. § 1415(f)(2)(b) ("A hearing officer *may* bar" evaluations or recommendations not disclosed five days prior to the hearing) (emphasis added); 34 C.F.R. § 300.512(b)(2) (same). *See also Pangerl v. Peoria Unified Sch. Dist.*, No. CV-14-00836-PHX-JJT, 2016 WL 354744, at *3–4 (D. Ariz. Jan. 29, 2016) (upholding an ALJ's decision to admit an exhibit that was disclosed less than five business days before the hearing); *Taylor*, 2005 WL 524586, at *4 (determining that "it was within the ALJ's discretion to allow the reports to be completed and provided to the parents even though that evidence was not disclosed to the plaintiffs pursuant to the 'five-day rule.'[1]"); *Cooper v. D.C.*, 77 F. Supp. 3d 32, 39 (D.D.C. 2014) (finding that "the IDEA vests Hearing Officers with…discretion" to "allow[] the testimony of an undisclosed witness,…at the due process hearing.") (citing, *inter alia*, 20 U.S.C. § 1415(f)(2)(b), 34 C.F.R. § 300.512(b)(2)).

Moreover, I conclude that the ALJ did not abuse his discretion by admitting the Reevaluation Report into evidence during the cross-examination of Dr. Silverman. First, as noted, counsel for HCPSS sought to admit the Reevaluation Report for purposes of impeachment during cross- examination, in response Silverman's testimony on direct examination regarding his practice and experience as an evaluator for MCPS. ECF 16, Hrg. Tr. 642:6-9 (July 7, 2015).

The report was not offered as substantive evidence.  Second, the parties reserved the right in their disclosure letters to offer additional witnesses and/or documents for impeachment or rebuttal purposes.  ECF 35-1; ECF 35-2.  Third, although plaintiffs argue that they were "'surprised'" and "'blindsided'" by the admission of the Reevaluation Report (ECF 34 at 14), on June 26, 2015, the second day of the hearing, counsel for HCPSS stated that he had "reports that Steve Silverman did in Montgomery County that are so deficient compared to [Ms. Celauro's report]." ECF 16, Hrg. Tr. at 478:18-20 (June 26, 2015).  However, according to defendants, plaintiffs "made no attempt to subpoena them and, indeed, made no inquiry about them."  ECF 35 at 11.

Finally, after the Reevaluation Report was presented, plaintiffs' counsel asked for a recess to permit Dr. Silverman to review the report.  The ALJ granted that request. Hrg. Tr. at 646-647 (July 7, 2015).  After the recess, the ALJ asked Dr. Silverman whether he was ready to proceed, and he responded, "Yes, Your Honor." *Id.* at 647:17.  If more time were needed, plaintiffs' counsel could have requested it or even asked for a continuance, which she did not. Under these circumstances, it does not appear that plaintiffs were "prejudiced", "surprised," or "blindsided" by the admission of the Reevaluation Report during cross-examination. *Cooper*, 77 F. Supp. 3d  at 39–40.

### b.  Relevance

Plaintiffs contend that the Reevaluation Report was not relevant, and they complain that the ALJ impermissibly admitted the Reevaluation Report and relied on it regarding the substantive issue of the appropriateness of the HCPSS Evaluation.  The report was not relevant to the merits.  However, the ALJ allowed HCPSS to use the Reevaluation Report to impeach Dr. Silverman as to his expert opinion regarding the inadequacy of the Psychological Assessment prepared by Celauro.  *See* ECF 16, Hrg. Tr. at 642:14-20; *id.* at 650:14-22  (July 7, 2015).

In his Decision, the ALJ pointed out that the kinds of criticisms and deficiencies that Silverman attributed to Celauro's report were far more evident in Silverman's 2006 report. The ALJ compared Silverman's testimony as to information "that is properly included in a psychological assessment and the propriety of [Celauro's] assessment" with Silverman's own work product. ECF 16, Decision, at 48. The comparison led the ALJ to "credit the knowledgeable and detailed testimony of Celauro over that of Silverman with regard to information that is properly included" in such reports. *Id.*

The ALJ explained, ECF 16, Decision, at 46-48:

> HCPS[S] submitted into evidence, during its cross-examination of Silverman, a 2006 Report of Psychologist that Silverman completed for an unrelated student for the purpose of impeaching Silverman's credibility as an expert. (Bd. Ex. 12)[] Although Silverman claimed that Celauro's Psychological Assessment was not comprehensive and was incomplete, it is interesting to note that Celauro's report was more detailed, included more scoring information, and included more analysis than Silverman's 2006 Report. Silverman's Report did not address any interviews with the student's teachers, the student's parents, or with the student. The reader could not determine from reading the report which educational records Silverman reviewed in preparing the report. Silverman did not indicate that he considered any writing samples in preparing his Report. Silverman briefly discussed the student's testing behaviors but, unlike Celauro, he failed to conclude that the student's test results were accurate and that the assessments were reliable and valid instruments. (Bd. Ex. 12).

> In addition, Silverman provided no description or explanation of the purpose of the testing instruments he used, little analysis of the test results, did not report all of the test scores he obtained from the parent and teachers who completed the rating scales on the Conners instrument, and included less information than Celauro in his scoring charts. Celauro explained that she hand-scored many of her test results to get a clearer picture of the Student's strengths and weaknesses. Silverman indicated that all of his test results were computer-generated.

> Silverman explained that his Report involved a reevaluation of a student who had already been determined to have an educational disability and had already been found eligible for special education and related services. He claimed that it was not necessary to provide as much background information, detail, or analysis in a reevaluation report. He admitted, however, that a reevaluation report is still used to determine a student's continuing eligibility for special education

services, the student's present levels of performance, the levels of special education and related services, the need for supplementary aids and services and accommodations, goals and objectives on an IEP, and for placement. In contrast, Celauro stated that she draws no distinction between an initial evaluation and a reevaluation for purposes of the nature and extent of information and the depth of analysis that should be included in a psychological assessment. Both types of evaluations must still be used to address important questions about a student's educational performance, potential educational disabilities, and educational needs. Celauro also explained that she includes all relevant information in her assessment report and does not hold back information for the purpose of presenting it orally at an IEP meeting.

The evidence in this record demonstrates that Celauro prepared a more detailed and insightful report than Silverman: she included a more complete record of the scores and results of the instruments used, included more detailed analysis of the results of the assessment, employed a clearer structure for presenting information in the Report, and included a more detailed description of the instruments used and their purpose.

The ALJ concluded, ECF 16, Decision, at 49: "I credit the knowledgeable and detailed testimony of Celauro over that of Silverman with regard to information that is properly included in a psychological assessment and the propriety of her Assessment."

The question is whether the ALJ erred or abused his discretion in allowing HCPSS to use the 2006 Silverman report for impeachment. "The extent and scope of the cross-examination of a witness and of impeachment evidence in respect to an appropriate subject rests, to a large extent, within the sound discretion of the trial court." *Lewis v. Owen*, 395 F.2d 537, 541 (10th Cir. 1968); cf. *United States v. Dominguez*, 604 F.2d 304, 310 (4th Cir. 1979) ("The scope of permissible impeachment of a witness in a criminal trial generally is committed to the sound discretion of the trial court."). "Administrative tribunals are given even freer scope in the application of the conventional rules of evidence." *N.L.R.B. v. Donnelly Garment Co.*, 330 U.S. 219, 236 (1947). *see also Brandon H. ex rel. Richard H. v. Kennewick Sch. Dist. No. 17*, 82 F. Supp. 2d 1174, 1182 (E.D. Wash. 2000) (applying the abuse of discretion standard to review the evidentiary rulings of the ALJ in an IDEA case).

Silverman's opinion testimony was undermined by his 2006 report, which included the kinds of deficiencies he attributed to Celauro, and others that were not found in Celauro's report. The ALJ was entitled to reject plaintiffs' contention that use of the Reevaluation Report for purposes of impeachment was improper merely because "the 2006 reevaluation was performed in an entirely different context than the *initial* evaluation of E.P." ECF 30 at 21-21 (emphasis in original). *See T.B.*, No. GJH-15-03935, 2016 WL 7235661, at *9 (explaining that "this Court is not reviewing this matter in a vacuum and cannot discard the informed opinions of T.B.'s educators and the credibility findings of the ALJ, who had the advantage of hearing the testimony."); *Wagner*, 340 F. Supp. 2d at 611 (noting that "in according 'due weight' to the findings of the ALJ, this court owes deference to the ALJ's determinations of the credibility of witnesses.").

I do not agree with plaintiffs that the ALJ relied on Dr. Silverman's Reevaluation Report substantively, *i.e.*, to conclude that Celauro's Psychological Assessment was appropriate. Rather, the ALJ relied on the Reevaluation Report for impeachment of Silverman's expert opinion testimony.

## B. Substantive Issues

As noted, plaintiffs argue that the HCPSS Evaluation "did not, as specifically required by IDEA, make any determination whether E.P. was a child with a disability and eligible under IDEA to receive Special Education." ECF 30 at 8. In addition, they argue that the Evaluation "failed to comprehensively evaluate E.P. in all areas of suspected disability and improperly evaluated E.P. for a suspected Specific Learning Disability [SLD] using an inappropriate methodology." *Id.*

### 1. Lack of Determination or Recommendation in HCPSS Evaluation

Plaintiffs argue that "the ALJ erred in finding that the [HCPSS Evaluation] was appropriate when HCPSS's evaluators made no determination, or even a recommendation, regarding whether E.P. is a child with a disability who is an eligible student under IDEA." ECF 30 at 28. According to plaintiffs, the ALJ "improperly restricted his entire focus on whether HCPSS's [Evaluation] fulfilled the procedural requirements of 34 C.F.R.§ 300.304, thereby ignoring the equally important *substantive* requirements set forth in Sections 300.305 and 300.306, and COMAR 13A.05.01.06(B)(2)(a) and (b), which mandate that a determination of eligibility *must be* part of the evaluation." *Id.* (emphasis in original); *see also id.* at 25.

Defendants counter that the ALJ correctly determined that there is no requirement under either federal or Maryland law that the two assessment reports, *i.e.*, the HCPSS Evaluation, contain a recommendation regarding E.P.'s IDEA eligibility. ECF 32-1 at 20. According to defendants, the federal and State regulations cited by plaintiffs, which plaintiffs claim mandate that the assessment reports include a determination of eligibility, have "nothing to do with an assessment report completed by a qualified examiner of a student suspected of an educational disability under the IDEA." *Id.* at 21. Rather, defendants maintain that the regulations cited by plaintiffs address "the statutorily required evaluation of a student suspected of having a disability, which is performed by an *IEP team*, not by an individual charged with completing an assessment." *Id.* (emphasis in original).

Defendants elaborate, ECF 35 at 15 (emphases in original):

> The Parents continue to confuse an *assessment report* completed by a qualified examiner of a child suspected of a disability, under Md. Code Regs. 13.05.01.05, with an *evaluation report* completed by an IEP team, under 34 C.F.R. §300.305 and Md. Code Regs. 13.05.01.06, which must include a determination of "[w]hether the student is a student with a disability." *Id.* at subsection C(2)(b)(iv). 34 C.F.R. §300.305 and Md. Code Regs. 13A.05.01.06 address an eligibility determination to be made *by an IEP team* in its evaluation

report, which is separate and distinct from the assessment reports completed by qualified examiners.

Neither IDEA nor the applicable federal and State regulations contain a requirement that the assessment reports include a recommendation or determination regarding IDEA eligibility. Rather, the applicable statute and regulations require *the IEP team* to make the determination regarding IDEA eligibility, in part *based on* the assessment reports completed by qualified examiners.

20 U.S.C. §1414(b)(4) states, in pertinent part (emphasis added):

Upon completion of the administration of assessments and other evaluation measures--

(A) the determination of whether the child is a child with a disability as defined in section 1401(3) of this title and the educational needs of the child shall be made *by a team of qualified professionals* and the parent of the child….

The implementing regulation, 34 C.F.R. §300.305(a) states, in part (emphases added):

As part of an initial evaluation (if appropriate) and as part of any reevaluation under this part, *the IEP Team* and other qualified professionals, as appropriate, must—

(1) Review existing evaluation data on the child, including—

(i) Evaluations and information provided by the parents of the child;

(ii) Current classroom-based, local, or State assessments, and classroom-based observations; and

(iii) Observations by teachers and related services providers; and

(2) On the basis of that review, and input from the child's parents, identify what additional data, if any, are needed to determine—

(i)(A) *Whether the child is a child with a disability, as defined in § 300.8*….

Similarly, COMAR 13A.05.01.06(C) states, in part (emphases added):

(1) To conduct an evaluation, *the IEP team* shall:

(a) Draw on information from a variety of sources, including:

    (i) Existing data;

    (ii) Current classroom-based, local, and Statewide assessments;

    (iii) Parent input; and

    (iv) Observations by teachers and related service providers; and

(b) Carefully consider and document information used as a basis of the team's decision.

(2) Evaluation Report.

    (a) *The IEP team* shall document its decision.

    (b) The written decision shall include:

        (i) Information provided by the parent;

        (ii) Results of assessment procedures used as a basis for determination;

        (iii) A statement as to whether the assessment procedures were valid for the purposes intended and valid for the student; and

        (iv) *Whether the student is a student with a disability*.

It is clear that 34 C.F.R. §300.305 ("Additional requirements for evaluations and reevaluations") and COMAR 13A.05.01.06 ("Evaluation, Reevaluation, and Eligibility") address the eligibility determination to be made by an IEP team in its evaluation report, which is separate and distinct from the assessment reports completed by qualified examiners. The requirements applicable to the assessment report to be completed by a qualified examiner are addressed by 34 C.F.R. §304 ("Evaluation procedures") and COMAR 13A.05.01.05 ("Assessment"). These regulations outline the appropriate methodologies for a qualified examiner to utilize in conducting an assessment of a student suspected of a disability. The procedural requirements are discussed, *infra*. Notably, these regulations do not contain a requirement that the qualified

examiner shall make a determination or recommendation regarding whether the child is a child with a disability.

The ALJ explained at length, ECF 16, Decision, at 41-42 (emphases added, alterations in final paragraph in original):

> Celauro testified that in HCPS[S], she is not permitted to make an ultimate determination regarding whether [E.P.] has an educational disability and whether he is eligible for special education services. She explained that these ultimate determinations are left to the IEP team as a whole, are not to be made by one individual, and should be made only after the IEP team has the opportunity to consider the results of the assessments and other available information. She explained that her role was to conduct the appropriate assessment and present her data and analysis to the IEP team. Bosse had a similar role with regard to her Educational Assessment. Celauro explained that the HCPS[S] Educational and Psychological Assessments were discussed and considered at the IEP meeting on December 2, 2014.
>
> This is consistent with clear language in the IDEA and the federal and State regulations. The statute provides that "upon completion of the administration of assessments and other evaluation measures," *a team of qualified professionals and the parent* shall make the determination of whether the child is a child with a disability and the educational needs of the child. 20 U.S.C. 1414(b)(4)(A) (2010). The State regulations, at COMAR 13A.05.01.06D(5)(a), also provide that when a student is suspected of having an SLD, *the IEP team* shall prepare a written report that includes whether the student has an SLD. The Parents argued that the Educational and Psychological Assessments were inappropriate because section 300.305 of the C.F.R. and COMAR 13A.05.01.06C(2) require an evaluator to make a decision as part of their assessment report as to whether a student is a student with a disability and regarding the educational needs of the student. They argued that the Assessment reports were deficient because they did not include these ultimate determinations. However, when section 1414(b)(4)(A) of the IDEA is read together with the federal and State regulations, *the IDEA requires only that the IEP team make these ultimate determinations*. Therefore, I find that the procedures used by HCPS[S] to defer the ultimate determination to the full IEP team of whether [E.P.] has an educational disability, is eligible for special education and related services, and what his educational needs are, after the assessments have been completed and considered was appropriate and consistent with the IDEA. Moreover, the language of C.F.R. section 300.304(c)(6) contemplates that a child has already been classified in a disability category, which does not apply to [E.P.] in this proceeding.

Celauro noted that she included language in her Psychological Assessment report that addresses the limited role of her individual assessment and the broader evaluative role of the entire IEP team. The Psychological Assessment report states in the Reason for Referral section that "[i]nformation obtained from this evaluation will be used to determine whether [E.P.] meets criteria for an educational disability of a [SLD] or [OHI] due to [ADHD]." (Bd. Ex. 3). The Summary and Recommendations section states that "[t]he results of this assessment should be shared with the IEP team and integrated with other assessment data to determine whether or not [E.P.] meets criteria for an educational disability." (Bd. Ex. 3). The IEP team properly reviewed the assessments and considered whether the assessments demonstrated that [E.P.] had an educational disability in the areas of suspected disability identified by the IEP team.

To be sure, the assessments are used by the IEP team to help determine "[w]hether the child is a child with a disability under § 300.8…." 34 C.F.R. § 300.304; *see also* COMAR 13A.05.01.05 (stating that the assessment shall employ "[a] variety of assessment tools and strategies…to enable *the IEP team* to determine…[i]f the student is a student with a disability….") (emphasis added). However, under federal and Maryland law, that determination is made by the IEP team, not by the individual examiner. *See* 20 U.S.C. §1414(b)(4); 34 C.F.R. §300.305(a); COMAR 13A.05.01.06(C); *see also A.B.*, 354 F.3d at 326 (stating that the "ALJ recognized that the IEP Team's determinations concerning AB's eligibility for special education services were, by law, 'solely the responsibility of the IEP team'" under federal and Maryland law.).

Accordingly, the ALJ correctly determined that the HCPSS Evaluation need not include a determination or recommendation regarding E.P.'s eligibility under IDEA.

2.  Methodology and Comprehensiveness of HCPSS Evaluation

a.

Plaintiffs argue that the Evaluation was insufficient and not comprehensive. ECF 30 at 31. They state, *id.* at 32:

HCPSS evaluated E.P. in some, but not all, areas of suspected disability and failed to analyze the results of the assessments compared to its knowledge of E.P. The evidence produced at the hearing fully demonstrates that the HCPSS failed to analyze the information it possessed about E.P. to ensure that it tested in all areas of suspected needs and to ensure that the recommendations were appropriate given the information. HCPSS failed to include a comprehensive assessment of, *inter alia*, E.P.'s academic achievement, his social/emotional functioning, and his behavior, to determine whether he is eligible for special education services under IDEA. Consequently, HCPSS lacked critical data with which to analyze the cause of E.P.'s retention in sixth grade and to determine whether he requires additional support.

Before turning to plaintiffs' specific complaints, I pause to review the applicable law regarding an appropriate evaluation.

As indicated, plaintiffs are only entitled to reimbursement for the IEE if the HCPSS Evaluation was not appropriate. 34 C.F.R. §300.502(b)(3). Federal law sets out clear requirements for an appropriate evaluation, including that a district "use a variety of assessment tools [and] not use any single measure or assessment ..." 20 U.S.C. § 1414(b)(2)(A). The evaluation must be "administered by trained and knowledgeable personnel", *i.e.*, by qualified examiners. 20 U.S.C. § 1414(b)(3)(A)(iv).

As noted, 34 C.F.R.§ 300.304 and COMAR 13A.05.01.05 outline in detail the requirements applicable to the assessment report to be completed by a qualified examiner. These two regulations set forth the appropriate methodologies for a qualified examiner to utilize in conducting an assessment of a student suspected of a disability.

34 C.F.R. 300.304 provides, in relevant part:

(b) Conduct of evaluation. In conducting the evaluation, the public agency must—

(1) Use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child, including information provided by the parent, that may assist in determining—

(i) Whether the child is a child with a disability under § 300.8; and

(ii) The content of the child's IEP, including information related to enabling the child to be involved in and progress in the general education curriculum (or for a preschool child, to participate in appropriate activities);

(2) Not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability and for determining an appropriate educational program for the child; and

(3) Use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors.

(c) Other evaluation procedures. Each public agency must ensure that—

(1) Assessments and other evaluation materials used to assess a child under this part—

***

(iii) Are used for the purposes for which the assessments or measures are valid and reliable;

(iv) Are administered by trained and knowledgeable personnel; and

(v) Are administered in accordance with any instructions provided by the producer of the assessments.

(2) Assessments and other evaluation materials include those tailored to assess specific areas of educational need and not merely those that are designed to provide a single general intelligence quotient.

***

(4) The child is assessed in all areas related to the suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities;

***

(7) Assessment tools and strategies that provide relevant information that directly assists persons in determining the educational needs of the child are provided.

Similarly, COMAR 13A.05.01.05(B), titled "Assessment Procedures", provides, in relevant part:

(1) A student shall be assessed in all areas related to the suspected disability, consistent with 34 CFR § 300.304(c)(4).

(2) A variety of assessment tools and strategies shall be used to gather sufficient relevant functional, cognitive, developmental, behavioral, academic, and physical information, and information provided by the parent to enable the IEP team to determine:

(a) If the student is a student with a disability;

(b) The student's educational needs;

(c) The content of a student's IEP, including information related to enabling the student to be involved in and progress in the general curriculum, or, for preschool students, to participate in appropriate activities; and

(d) Each special education and related service needed by a student, regardless of whether the need is commonly linked to the student's disability.

(3) A single procedure may not be used as the sole criterion for determining:

(a) If a student is a student with a disability; and

(b) An appropriate educational program for a student.

Of significance, "[w]hen challenging an educational evaluation, the pivotal question is whether the District's methods employed were adequate." *G.D.*, *supra*, 2017 WL 379440, at *3. This is because the "'key to an educational evaluation is the methodology employed.'[]" *Id.* (citation omitted). Accordingly, the "'conclusions, or lack thereof, cannot be inadequate unless the methodology is inadequate, because that is the only provision in the law.'" *Parker C. through Todd v. W. Chester Area Sch. Dist.*, No. CV 16-4836, 2017 WL 2888573, at *12 (E.D. Pa. July 6, 2017) (citation omitted); *see also L.S.*, *supra*, 2007 WL 2851268, at *12 (explaining that IDEA "requires only that the proper assessment tools and qualified individuals conduct the evaluation.") (citing 20 U.S.C. § 1414(b)(2)).

"'In challenging an evaluation, courts have found that a parent 'cannot simply argue that the evaluation was inappropriate because they disagree with its findings.'" *Parker C.*, 2017 WL 2888573, at *12 (citation omitted). In *G.D.,* 2017 WL 379440, at *3, the court explained:

> Because IDEA evaluations depend on the exercise of professional judgment, they are entitled to a reasonable degree of deference.[ ] Accordingly, when plaintiffs challenge a decision reached by an educational professional, they must show more than simple disagreement with the conclusion; they must show the professional judgment rendered is actually wrong, and not just in doubt.[ ] For example, a plaintiff must show evidence of a flawed evaluation process, by failing to follow regulatory requirements, or if the district failed to investigate an area of suspected disability with little or no explanation why.[ ]

*See also L.S.*, 2007 WL 2851268, at *12 (explaining that an evaluation may be inappropriate when the school district could not show that it had tested in all areas of suspected disabilities such as when "[t]he IEE uncovered disabilities that the evaluation hadn't even considered.").

With these principles in mind, I turn to plaintiffs' specific complaints regarding the sufficiency of the HCPSS Evaluation.

b.

Plaintiffs complain that the Evaluation "failed to explain severe discrepancies between E.P.'s intellectual ability and his academic achievement." ECF 30 at 32. They observe that several of E.P.'s scores on the WJ-III achievement tests "are *significantly* lower" than E.P.'s intellectual ability, as measured by his full scale IQ. *Id.* (emphasis in original). Defendants counter that plaintiffs "provide no support for the proposition that either Ms. Celauro's psychological assessment or Ms. Bosse's educational assessment was required to contain such a discrepancy analysis." ECF 32-1 at 26.

As noted by the ALJ, "HCPS[S] does not use the . . . discrepancy model in determining whether a student has an SLD." ECF 16, Decision, at 18. Notably, the applicable regulations prohibit a state from requiring use of a discrepancy model as the basis to determine whether a

student has a SLD. *See* 34 C.F.R. § 307(a) (stating that a state "[m]ust not require the use of a severe discrepancy between intellectual ability and achievement for determining whether a child has a specific learning disability…."); *see also* ECF 16, Decision at 39. Thus, the HCPSS Evaluation was not required to include a discrepancy analysis.

Plaintiffs also complain that Bosse should have administered certain WJ-III achievement subtests, such as "Word Attack, Reading Vocabulary, Quantitative Concepts, Editing, or Academic Knowledge to investigate additional areas of discrepancy…." ECF 30 at 33.

Bosse administered nine WJ-III subtests, including Letter-Word Identification, Reading Fluency, Calculation, Math Fluency, Spelling, Writing Fluency, Passage Comprehension, Applied Problems, and Writing Samples. ECF 16, Educational Assessment. The ALJ said, ECF 16, Decision, at 54:

> Bosse explained that in this case she did not administer the extended battery to [E.P.], which consists of the additional subtests of Word Attack, Spelling of Sounds, Sound Awareness, Punctuation and Capitalization, and Editing, because she concluded that [E.P.] performed well in the standard battery of subtests. In fact, [E.P.] scored generally in the average, high average, and superior range on the subtests in reading, writing, and math. He had only one score, in Math Fluency, that was in the low average range. Bosse explained that she did not want to take him out of class and have him lose instructional time to administer additional assessments when she determined that he already had the skills that would have been assessed in the extended battery.

The ALJ also noted that Bosse explained that, despite E.P.'s weakness in math fluency, his results in the other math tests showed that this weakness "did not impact his overall ability in math calculation skills or in his broad math ability." *Id.* at 55.

Bosse's exercise of professional judgment in deciding not to administer additional subtests was entitled to substantial deference by the ALJ and by this Court. *A.B.*, *supra*, 354 F.3d at 325-26. Plaintiffs have not met their burden to demonstrate that Bosse's assessment was inappropriate merely because she did not administer additional, optional WJ-III subtests.

Plaintiffs also complain: "Although E.P.'s score in the Processing Speed subtest [of WISC-IV] was considerably discrepant from his other scores, Ms. Celauro nevertheless did not calculate E.P.' s General Ability Index ('GAI'), which is an alternative method for calculating a student's cognitive ability where a student's lower Working Memory or Processing Speed scores may be skewing the student's overall cognitive score." ECF 30 at 12.

The ALJ rejected this argument. He said, ECF 16, Decision, at 49:

> Celauro explained that the GAI is an alternate way of calculating a student's cognitive ability, which considers only a student's verbal comprehension and perceptual reasoning skills, but does not consider a student's scores in the areas of working memory and processing speed. Celauro explained that GAI is a suggested method of calculation, but is not required. She went on to explain why she does not use GAI when calculating a student's cognitive ability. Celauro pointed out that the technical bulletin creating GAI also stated that it was not necessarily a more accurate score than the full-scale IQ. She explained that she adheres to the general view of the WISC-IV publishers that working memory and processing speed are important factors in a student's overall cognitive functioning. (Tr. 429-431, 446). For these reasons, I conclude that Celauro's decision not to calculate [E.P.'s] GAI was entirely proper.

The ALJ was entitled to credit Celauro's exercise of her professional judgment. *A.B., supra*, 354 F.3d at 325-26. Plaintiffs have not met their burden to demonstrate that Celauro's assessment was inappropriate because she did not calculate E.P.'s GAI.

Plaintiffs next argue that the HCPSS Evaluation was inappropriate because the evaluators failed to discuss assessment reports that led to a Section 504 Plan for E.P. and his placement in the "Talented and Gifted Program" in his previous school district. ECF 30 at 33; *see also* ECF 34 at 19. Defendants counter that there is no requirement under IDEA that the Evaluation include this "historical information" (ECF 32-1 at 28); that this case does not involve E.P.'s Section 504 Plan; and that "Celauro devoted an entire paragraph to a discussion of E.P.'s 504 Plan." ECF 35 at 17; *see also* ECF 32-1 at 27.

The ALJ said: "As part of the Assessment, Celauro reviewed and considered [E.P.'s] educational history, educational records, including his 504 Plan and accommodations, attendance history, grade history, comments on report cards, progress reports, any records provided by [PGC], and other information regarding how [E.P.] was progressing in school." ECF 16, Decision, at 14. Moreover, the ALJ noted, *id.* at 45:

> Celauro included in the Psychological Assessment thorough background information, educational history, grades, and [E.P.'s] relevant diagnosis of ADHD, Predominantly Inattentive Type, and his related medication. The Assessment noted that the Student has a Section 504 Plan since December 2011, and it listed all his 504 Plan accommodations. The Assessment also noted that [E.P.] has been taking the medication Concerta since he was in second grade to treat ADHD.

*See also* ECF 16, Psychological Assessment, at 2 (detailing E.P.'s Section 504 plan and related accommodations). Celauro also noted that E.P. was previously identified for the Talented and Gifted Program in P.G. County based on his standardized test scores and teacher ratings, but that he was not currently enrolled in those classes. *Id.* at 2.

I am unaware of any provision requiring a qualified examiner to include in an assessment information or data that led to a prior decision to provide a student with a 504 Plan or to place a student in a program for gifted students. In any event, Celauro provided historical information in her the Psychological Assessment regarding E.P.'s 504 Plan and regarding his prior placement in a gifted program. *See* ECF 16, Psychological Assessment, at 2. Plaintiffs have not shown that the historical information detailed by Celauro was insufficient.

In addition, plaintiffs complain that although the Evaluation identified concerns with inattention, working memory, and organization based on the Conners 3 and BRIEF rating scales, as well as concerns regarding attention and daily living skills based on the BASC-2 rating scale, the "HCPSS Evaluation pointedly failed to explain how those concerns affect E.P.'s academic

progress." ECF 30 at 34. According to plaintiffs, "these scores were not linked to any discussion of E.P.'s needs or to any recommendations for supports." *Id.* at 35. Defendants counter that plaintiffs "fail to provide any support for the proposition that such an analysis was required by the IDEA or its Maryland state counterpart." ECF 32-1 at 29.

As noted by the ALJ, Celauro "concluded that the ratings of [E.P.'s] behaviors on the instruments she used showed concerns with inattention, working memory and organizational skills that were consistent with his [Attention Deficient Hyperactivity Disorder] diagnosis." ECF 16, Decision, at 50; *see also* ECF 16, Psychological Assessment, at 7. I agree with defendants that plaintiffs have "fail[ed] to explain what other analysis Ms. Celauro would have been obligated to perform." ECF 32-1 at 29. Moreover, Celauro provided recommendations regarding these concerns. In particular, she noted that E.P. "would continue to benefit from extended time to complete tasks and assignments" and that he "may benefit from subtle reminders when he is off task and checking for his understanding of a task before he begins, in order to make sure that he understands the directions." ECF 16, Psychological Assessment, at 7.

Plaintiffs also complain that the Evaluation "failed to include a clinical interview with E.P. or a student self-report…." ECF 30 at 35. They add, *id.*: "As Dr. Silverman testified, a clinical interview and self-report would have provided vital, critical information regarding E.P.'s own assessments of his areas of weakness and strength, as well as insight into his executive functioning and emotional functioning…."

The ALJ considered this contention. He said: "Silverman stated that the school psychologist should have conducted an interview with the Student and with his parents, and should have obtained a self-report form from the Student, as part of the Psychological Assessment." ECF 16, Decision, at 44. However, he concluded that plaintiffs "did not show that

the IDEA requires a school psychologist to conduct interviews with a student or his parents, or requires that a student submit a self-report as part of the Psychological Assessment." *Id.*

Moreover, based upon Celauro's testimony, the ALJ found that "Celauro did not give [E.P.] a self-report form for her Psychological Assessment because she believes that elementary and middle school students, based on age and development, are less self-aware of their difficulties. She has used student self-reports on other occasions when she believes that a student is self-aware and has great insight." ECF 16, Decision, at 21, ¶ 77; *see also id.* at 44-45; ECF 16, Hrg. Tr. at 513:21-514:3 (June 26, 2015). In addition, the ALJ noted that although Celauro did not conduct an interview of E.P. or his Parents, the rating scales she gave to E.P's mother, and the input from the mother, "allowed [E.P.'s] mother to provide Celauro with critical information in the Psychological Assessment regarding [E.P.'s] behaviors related to ADHD and certain social-emotional issues, as well as his executive function skills." *Id.* at 44; *see also id.* at 46. As the fact finder, the ALJ was permitted to credit Celauro's professional judgment. *A.B.*, 354 F.3d at 325-26; *Doyle*, 953 F.2d at 104; *Wagner,* 340 F. Supp. 2d at 611; *Justin G.,* 148 F.Supp.2d at 588. The HCPSS Evaluation was not inappropriate merely because the evaluators did not interview E.P. or his Parents.

Further, plaintiffs contend that the Evaluation was inappropriate because it failed to include a handwriting assessment. Plaintiffs explain, ECF 30 at 35: "Dr. Silverman testified that E.P.'s handwriting was unusually poor and illegible, which indicated additional underlying educational issues, and that a proper evaluation would have included an assessment of E.P.'s handwriting and fine motor skills." Plaintiffs also claim that they were prevented from providing additional evidence regarding E.P.'s alleged handwriting problems because the ALJ quashed the subpoenas for E.P.'s teachers. But, plaintiffs provided no information suggesting that any of

E.P.'s teachers ever reported to E.P.'s Parents, to Bosse, or to Celauro that E.P. had handwriting problems.

The ALJ determined that "no evidence was presented in the hearing to demonstrate that the IEP team discussed or approved an occupational therapy assessment or other assessments in the area of fine motor skills." ECF 16, Decision, at 44. But, he noted that, "aside from Silverman's testimony, no documents or other evidence were presented to show that E.P. had problems with handwriting or fine motor." *Id*. In addition, as observed earlier, the ALJ expressly "credit[ed] the knowledgeable and detailed testimony of Celauro over that of Silverman with regard to the information that is properly included in a psychological assessment…." *Id.* at 48.

The ALJ's decision to credit the testimony of Celauro is entitled to deference. And, without any other evidence indicating that E.P. has problems with his handwriting or fine motor skills, I cannot conclude that the HCPSS Evaluation was inappropriate for failing to include a handwriting assessment.

Next, plaintiffs complain that the classroom observation data contained in the assessment reports was not complete. In particular, plaintiffs contend that although the classroom observations of E.P. noted E.P.'s "time on task and attention", they "failed to encompass E.P.'s academic functioning in the classroom." ECF 30 at 36. In their view, "it remains unclear, based on the Evaluation Report, how E.P. was functioning and comprehending academically beyond his inattention and the need for redirection." *Id.* Defendants counter, ECF 32-1 at 30: "[T]he Parents appear to believe that the observer was required to somehow gaze into E.P.'s mind to determine the extent to which he was comprehending the lesson observed. The report of the

observations described E.P.'s observable behaviors, which is all that could reasonably be expected."

Under 34 C.F.R. § 310(a), "[t]he public agency must ensure that the child is observed in the child's learning environment (including the regular classroom setting) to document the child's academic performance and behavior in the areas of difficulty." In this regard, the ALJ said, ECF 16, Decision, at 51-52:

> The Parents contend that HCPS[S] failed to observe [E.P.'s] academic performance in the regular education classroom. Contrary to the Parents' contention, Celauro conducted classroom observations in [E.P.'s] regular education [English/Language Arts] "ELA" and Math classes and recorded her observations in the Psychological Assessment. Celauro explained in her Assessment report that she observed [E.P.] in the classroom to gauge his functioning in the academic environment. Celauro addressed [E.P.'s] behaviors and his participation in classroom activities and class assignments. Celauro addressed [E.P.'s] classroom behavior, where he exhibited periods of inattention. She noted, however, that [E.P.] was easily redirected, was ultimately attentive to teacher-led instruction, and subsequently worked on the class assignment involving math problems that were being reviewed in his Math class. She noted that in his ELA class, [E.P.] worked on the class assignment related to answering questions about the assigned novel, he did not require assistance from the teacher concerning the classroom assignment, and he displayed only brief moments of inattention. (Bd. Ex. 3). Celauro concluded that [E.P.] was somewhat inattentive, but was able to meaningfully participate in classroom activities. Celauro also explained that she used her classroom observations to determine whether [E.P.] was having difficulty engaging in the curriculum based on his behaviors and the teacher's instruction.

Based on the foregoing, the ALJ said, *id.* at 52: "I conclude that Celauro's classroom observations complied with the requirements to document [E.P.'s] academic performance and behavior in areas of difficulty. 34 C.F.R. §300.310(a)."

Plaintiffs have provided no meaningful explanation as to why this Court should reject the ALJ's finding that Celauro's reported observations of E.P. satisfied the requirements of 34 C.F.R. § 310(a).

In addition, plaintiffs assert that the assessments "failed to include a thorough FBA to address E.P.'s behavioral and social/emotional needs. . . ." ECF 30 at 36. They contend that the ALJ's conclusion with regard to the FBA is "fatally flawed, because it depended on a finding that the FBA was not considered in determining E.P.'s eligibility under IDEA." ECF 34 at 20. In response, defendants noted that the appropriateness of the FBA was not an issue raised in the due process complaint and therefore the ALJ properly declined to consider it. ECF 35 at 19.

As indicated, the ALJ concluded, for various reasons, that the appropriateness of the FBA was "outside the scope of issues to be addressed" at the administrative hearing. The ALJ determined, *inter alia*, that that issue was not raised in HCPSS's due process hearing complaint. ECF 16, Decision, at 54. Moreover, the ALJ recounted that he issued a Prehearing Conference Report and Order on May 27, 2015, in which he identified the issues as follows: "The issues are whether the educational and psychological evaluations conducted by HCPS[S] in November 2014 are appropriate, and whether the Parents are entitled to an IEE at public expense." *Id.* at 53. Thereafter, he "afforded the parties five days to file a motion to correct that document." *Id.* But, plaintiffs did not do so. Accordingly, the ALJ found that plaintiffs "waived any other claims in this proceeding." *Id.* By failing to request a correction of the issues identified in the Report, the ALJ found that "the Parents failed to place HCPS[S] on notice that the appropriateness of the FBA was an issue to be litigated in this proceeding." *Id.* at 53-54.

Further, the ALJ concluded that the appropriateness of the FBA was "outside the scope of issues to be addressed" at the administrative hearing because the FBA was not used to determine E.P.'s eligibility for special education and related services. ECF 16, Decision, at 54. He said, *id.* at 53:

> The Parents contend that the HCPS[S] Assessments are inappropriate
> because the FBA conducted by Celauro was not thorough. The evidence

establishes that Celauro conducted an FBA in response to the Parents' request raised at a Section 504 meeting on September 8, 2014 and performed classroom observations related to the FBA. This is confirmed in the September 8, 2014 504 Plan document. (Parents Ex. 9). This occurred before the IEP team approved the Educational and Psychological Assessments at the October 6, 2014 IEP meeting. Celauro explained that the FBA was not used to determine [E.P.'s] eligibility for special education and related services, although it was subsequently reviewed by the IEP team along with the other Assessments. She stated that formal consent from the IEP team is not needed to conduct an FBA because any team that addresses student concerns can decide to conduct an FBA, including through the Section 504 process. The IDEA does not require a school to use an FBA when initially testing a student for suspected disabilities. *D.K v. Abington Sch. Dist.*, 696 F.3d 233, 251 (3rd Cir. 2012). In fact, FBAs are only addressed in the IDEA and the federal regulations in the sections concerning disciplinary procedures and manifestation determinations. 20 U.S.C. §1415(k)(1)(D), (F) (2010); 34 C.F.R. §300.530(d)(l), (f)(l).

Plaintiffs also contend that HPCSS "impermissibly neglected to use IDEA criteria to determine whether E.P. has an SLD when it failed to use research-based procedures in its evaluation process; indeed, HCPSS's evaluation of E.P. consisted of a mere regurgitation of data collected without the necessary analysis and recommendations required by IDEA and Maryland law." ECF 30 at 37. Defendants counter that HCPSS properly relied on the "patterns of strengths and weaknesses approach" in conducting their assessments. ECF 32-1 at 33.

At the administrative hearing, plaintiffs argued "that the method used by HCPS[S] in assessing whether [E.P.] has an SLD, the pattern of strengths and weaknesses model, 'is clearly outside the bounds of IDEA.'" ECF 16, Decision, at 38 (citation omitted). The ALJ concluded that plaintiffs' argument was "clearly erroneous." *Id.* He explained, *id.* at 39-40 (emphases in Decision, second bracket alteration added, other alterations in Decision):

> Section 300.307 of the CFR provides that "[a] State must adopt, *consistent with §. 300.309,* criteria for determining whether a child has a specific learning disability as defined in § 300.308(c)(10)." (emphasis added). This section goes on to provide that, *in addition,* the criteria that a State adopts must not require use of a severe discrepancy model, must permit the use of the [response to intervention] model, and may permit the use of other alternative research-based procedures for determining whether a student has an SLD. 34 C.F.R. § 300.307(a)(1-3). Based

on the reference to section 300.309 of the CFR, it is clear that section 300.307 did not intend to provide an exhaustive list of the criteria to be used in assessing whether a student has an SLD. Section 300.307(a) provides only certain rules that must be applied when considering whether a child has an SLD. A careful review of CFR section 300.309, which is entitled "Determining the existence of a specific learning disability," demonstrates that the IDEA and accompanying regulations recognize the pattern of strengths and weaknesses model as an appropriate method for determining whether a student has an SLD. In identifying the strengths and weaknesses model as an appropriate method for determining whether an SLD exists, CFR section 300.309 defines this model as follows:

> (ii) The child exhibits a pattern of strengths and weaknesses in performance, achievement, or both, relative to age, State-approved grade-level standards, or intellectual development, that is determined by the group to be relevant to the identification of a specific learning disability, using appropriate assessments, consistent with *§§* 300.304 and 300.305[.]

34 C.F.R. § 300.309(a)(2)(ii) (2014).

A careful review of the COMAR regulations demonstrates that Maryland has also adopted the strengths and weaknesses model as an appropriate method for determining whether a student has an SLD. COMAR I3A.05.01.06D addresses the procedures for determining whether a student has an SLD and COMAR 13A.05.01.06D(3) provides as follows:

> (3) The IEP team may consider evaluative data and appropriate assessments, consistent with 34 CFR *§§* 300.304 and 300.305, if the team determines that data to be relevant to the identification of an SLD if the student:
> ….
> (ii) Exhibits a pattern of strengths and weaknesses in performance achievement, or both, relative to age, State-approved grade-level standards. or intellectual development.

COMAR 13A.05.01.06D(3)(ii).

The ALJ concluded, *id.* at 40:

> It is clear that both the IDEA and the State of Maryland have approved the pattern of strengths and weaknesses model as an appropriate method for determining whether a student has an educational disability of an SLD. Therefore, the Parents' claim that the Educational and Psychological Assessments are inappropriate because HCPS[S] did not prove that the pattern of strengths and weaknesses model is an alternative research-based procedure for determining whether a child has an SLD, must fail. The evidence presented, and the law

governing this matter, demonstrate that HCPS[S]'s reliance on the pattern of strengths and weaknesses model for determining whether [E.P.] has an SLD was a proper method for this determination under both federal and State law.[]

The ALJ also said, *id.* at 51:

I conclude, contrary to the Parents' argument, that HCPS[S] employed appropriate instruments and measures that were designed to evaluate the Student in all areas of suspected disability that were identified by the IEP team. . . . I further conclude that the instruments selected by each evaluator were properly designed to test the Student in the areas of suspected disability identified by the IEP team. I also conclude that the Assessments contained appropriate analysis of the results of the instruments that were administered and included appropriate recommendations for the Student's educational plan.

The ALJ is correct that both IDEA and Maryland have approved the pattern of strengths and weaknesses model as an appropriate method for determining whether a student has a SLD. And, plaintiffs have not offered any plausible basis, beyond speculation, to suggest that Celauro did not properly utilize this method.

Finally, plaintiffs complain that the HCPSS Evaluation failed to include adequate analysis of why E.P. is doing so "poorly" in school, given his "superior intellectual ability." ECF 30 at 34. In addition, they maintain that the Evaluation failed to address Dr. Silverman's testimony "that, taking into account E.P.'s cognitive abilities and the fact that, when [E.P.] was evaluated, he was repeating sixth grade, he should have been getting As…" *Id.* at 36. *See also* Hrg. Tr. at 604-605 (July 7, 2015). Plaintiffs explain, ECF 30 at 34, (citation omitted, emphases in original):

As Dr. Silverman explained, "[t]here's a whole lot more interpretation needed about the whole question why this child perennially for three or four years failed and barely ... squeaked by, did okay the second year in 6th grade. There's no interpretation here of the blaring question why ... this child did so poorly, why does he do so poorly."

Furthermore, the Evaluation Report listed E.P.' s grades…, but did not meaningfully acknowledge that those grades reflect E.P.' s ***second time learning the sixth grade material*** and, therefore, likely do not accurately represent his

achievement. Because the Evaluation Report omitted the grades from his *first* year in sixth grade, and did not address that he is *relearning the same material* due to his retention, it presented a grossly misleading picture of E.P.'s ability.

Defendants counter that plaintiffs "provide no authority for the proposition that Ms. Celauro was required to provide such an analysis." ECF 32-1 at 28. Defendants also state, *id.*:

> ALJ Koteen considered Dr. Silverman's "claim[] that the assessment failed to include adequate analysis of why [E.P.] was not successful the first time he attended sixth grade, and why he did not perform better when he repeated sixth grade." *ALJ Decision* at 44. However, ALJ Koteen rejected Dr. Silverman's claim based upon his lack of familiarity with the diagnostic questions that Ms. Celauro was addressing through her assessment report. *Id.*

In particular, the ALJ said, ECF 16, Decision, at 44:

> Despite these claimed inadequacies, Silverman's testimony demonstrated that he was not familiar with the diagnostic questions set forth in the Referral section of Celauro's Assessment, which identified the diagnostic questions that the Assessment was designed to address, as to whether he meets the criteria for an educational disability of SLD or OHI to ADHD.

As noted, the ALJ's credibility determinations are entitled to deference. *Wagner*, 340 F. Supp. 2d at 611; *see Justin G.,* 148 F. Supp. 2d at 588; *see also Doyle,* 953 F.2d at 104.

Moreover, the ALJ pointed out that Celauro recounted E.P.'s difficulties during his first sixth grade year, in 2013-2014. He said, ECF 16, Decision, at 45-46:

> Celauro also addressed in the Assessment that [E.P.] had struggled with attendance during the 2013-2014 school year, had a substantial number of absences and tardies during that year (22 absences and 73 tardies noted on his report card), and was retained in the sixth grade for the 2014-2015 school year. She also included in her report that he failed to complete work and was disengaged from class activities during his first year in sixth grade. Celauro also noted in her Assessment that [E.P.'s] attendance and tardiness were much improved during the current school year, with [E.P.] having only one absence and nine tardies at the time she completed her Report on November 25, 2014. She also noted [E.P.'s] placement in the [alternative education program] during the third quarter of the 2013-2014 school year, where he obtained additional support that led to significant improvement in his completion of work and overall academic performance by the end of the school year.

Plaintiffs do not specifically explain what additional analysis was required. Moreover, plaintiffs' complaints in this regard seem to challenge the results of the HCPSS Evaluation, rather than the methodology. In other words, plaintiffs and Dr. Silverman believe that because E.P. repeated the sixth grade, and was going over the same material for a second time, E.P. should have been receiving better grades and, accordingly, some additional, unspecified, testing or analysis was required to explore why he was not receiving better grades. However, if one accepts Celauro's analysis of this issue, it does not appear that E.P. was necessarily relearning the same material for a second time given his numerous absences from school and the fact that during his initial sixth grade year, he was disengaged from his classes and failed to complete assignments. ECF 16, Psychological Assessment, at 2. Moreover, as indicated, both Bosse and Celauro found that E.P.'s performance in school improved during his second sixth grade year and that he was achieving at grade level.

As stated earlier, "'[i]n challenging an evaluation, courts have found that a parent 'cannot simply argue that the evaluation was inappropriate because they disagree with its findings.'" *Parker C.*, 2017 WL 2888573, at *12 (citation omitted). Rather, "[w]hen challenging an educational evaluation, the pivotal question is whether the District's methods employed were adequate." *G.D.*, 2017 WL 379440, at *3. Plaintiffs do not explain what specific analysis or additional testing should have been conducted to analyze the issue of why E.P. was allegedly doing so "poorly" in school, in light of his "superior intellectual ability." ECF 30 at 34.

## V. Conclusion

The ALJ said, ECF 15, Decision, at 49:

> Contrary to the Parent's contention, the evidence demonstrates that
> HCPS[S] conducted appropriate assessments based on the Student's individual
> needs, which provided sufficient information to the IEP team to make

recommendations for the Student's placement and program if he were determined eligible for special education and related services.

That finding was predicated on a thorough, careful, and comprehensive review of the evidence by the ALJ, as detailed in the Decision.

I agree with the ALJ that Bosse and Celauro conducted comprehensive assessments that complied with the IDEA and applicable federal and State regulations. To conduct an appropriate evaluation, the agency must "use a variety of assessment tools [and] not use any single measure or assessment ..." 20 U.S.C. § 1414(b)(2)(A); *see also* 34 C.F.R.§ 300.304; COMAR 13A.05.01.05. Evidence at the administrative hearing demonstrated that Bosse and Celauro assessed E.P. for suspected learning disabilities. The only untested area of suspected disability presented by the Parents, via Dr. Silverman, concerned handwriting. And, the ALJ did not find the concern meritorious, ECF 16, Decision, at 44.

In performing their assessments, Bosse and Celauro utilized a variety of assessment tools, including teacher input, cognitive and achievement tests, as well as classroom observations. The HCPSS Evaluation contains sufficient information to "assist the IEP Team in forming conclusions and determination for the child's education placement." *L.S.*, 2007 WL 2851268, at *11.

To be sure, the Parents were not required to obtain their own IEE of E.P. before the administrative proceeding. But, the record does not contain substantive evidence that conflicted with findings in the Evaluation. Nor was there evidence that uncovered disabilities that the HCPSS Evaluation did not consider.

The ALJ said, ECF 16, Decision, at 56: "While the Parents may disagree with some of the conclusions in the Assessments, and may disagree with subsequent decisions made by the IEP team after the assessments were completed and considered, these disagreements do not

render the Assessments themselves inappropriate…." He added: "[T]the critical question before me is not the *results* of the HCPS testing, or any actions taken by the IEP team after the Assessments were considered, but whether the Assessments were properly administered in accordance with the standards and requirements set forth above. *Id.* (emphasis in original).

In my view, plaintiffs have failed to demonstrate that the methodology employed by HCPSS was flawed. Instead, they largely highlight instances of disagreement with the Evaluation and the ultimate determination of non-eligibility. Plaintiffs have not met their burden to demonstrate that the HCPSS Evaluation was inappropriate.

For the foregoing reasons, plaintiffs' Motion (ECF 29) shall be denied and HCPSS's Cross Motion (ECF 32) shall be granted. An Order follows.


Date: August 21, 2017

_____/s/_____
Ellen Lipton Hollander
United States District Judge